[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 06-15514 & 06-15874

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 3, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-01686-CV-MHS-1

KENNY A., by his next friend Linda Winn,
KARA B., by her next friend Linda Pace,
MAYA C., by her next friend Linda Pace,
PHELICIA D., by her next friend Theresa Roth,
SABRINA E., by her next friend Rebecca Silvey,
KORRINA E., by her next friend Rebecca Silvey,
TANYA F., by her next friend Carol Huff,
PRISCILLA G., by her Next Friend Roslyn M.
Satchel,
BRIANA H., by her next friend Linda Pace, on their
own behalf and on behalf of all others similarly
situated,

Plaintiffs-Appellees-
Cross-Appellants,

versus

SONNY PERDUE, in his official capacity as Governor
of the State of Georgia,
DEPARTMENT OF HUMAN RESOURCES OF THE STATE OF
GEORGIA,
JAMES MARTIN, in his official capacity as
Commissioner of the Department of Human Resources

of the State of Georgia,
DIVISION OF FAMILY AND CHILDREN SERVICES, Fulton
County,
BEVERLY JONES, in her official capacity as
Director of the Fulton County Department of Family
and Children Services,
DEKALB COUNTY DFCS,
WAYNE DRUMMOND, in his official capacity as
Director of the DeKalb County Department of Family
and Children Services,

Defendants-Appellants-
Cross-Appellees,

FULTON COUNTY,
DEKALB COUNTY,

Defendants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

**(July 3, 2008)**

Before CARNES, WILSON and HILL, Circuit Judges.

CARNES, Circuit Judge:

When asked how much money would be enough for him, John D.

Rockefeller reportedly said: "Just a little bit more."[1]  The attorneys for the

---

[1]  Robert M. Sharp, <u>The Lore and Legends of Wall Street</u> 233 (1989).

plaintiff class in this case want more than just a little bit more. They want a lot more money than they would receive from multiplying the number of hours they worked on this case by the hourly rate they charge. And the district court gave them a lot more—$4,500,000 more—out of the pockets of the taxpayers of Georgia.

Not caught up in the district court's spirit of generosity with their money, the Georgia taxpayers (through their governor and other officials who are defendants) have appealed the attorneys' fees award because of that multi-million dollar enhancement and for other reasons. The plaintiffs' attorneys, convinced that the district court was not generous enough, have cross-appealed (through the class they represent), insisting that they deserve even more than the $10,500,000 total fees that the court awarded them.

## I.

Kenny A. and eight other named plaintiffs in this lawsuit are foster children in the custody of the Georgia Department of Human Resources. Kenny A. ex rel. Winn v. Perdue, 454 F. Supp. 2d 1260, 1266 (N.D. Ga. 2006) (Kenny A. III). In June 2002, on behalf of a class of all foster children in Fulton and DeKalb Counties and a subclass of African American foster children, the plaintiffs sued the governor, DHR, its commissioner, Fulton and DeKalb Counties, each county's

department of family and children services, and the director of each of those departments.  Id. at 1266–67.  The complaint alleged systemic deficiencies in the counties' foster care systems.  Id. at 1267.  These deficiencies, according to the complaint, included:

> (1) assigning excessive numbers of cases to inadequately trained and poorly supervised caseworkers; (2) not developing a sufficient number of foster homes properly screened to ensure the plaintiff children's safety; (3) not identifying adult relatives who could care for the plaintiff children as an alternative to strangers or impersonal institutions; (4) failing to provide relevant information and support services to foster parents in order to prevent foster placements from being disrupted; (5) failing to develop administrative controls such as an information management system that ensures plaintiff children are expeditiously placed in a foster home matched to meet the children's specific needs; (6) failing to provide timely and appropriate permanency planning, including failing to provide services that would enable plaintiffs to achieve their permanency planning goals; (7) placing plaintiffs in dangerous, unsanitary, inappropriate shelters and other placements; (8) failing to provide appropriate and necessary mental health, medical, and education services to children in their custody; and (9) separating teenage mothers in foster care from their own children and separating siblings in foster care from each other without providing visitation.

Id.

The complaint asserted fifteen causes of action under federal and state law. Kenny A. ex rel. Winn v. Perdue, 218 F.R.D. 277, 283 (N.D. Ga. 2003) (Kenny A. I).  The federal law claims included alleged violations, brought under 42 U.S.C. § 1983, of the class members' Fourteenth Amendment rights to substantive and

4

procedural due process and their First, Ninth, and Fourteenth Amendment rights to liberty, privacy, and association. Id. The complaint also alleged violations of the class members' statutory rights under the Adoption Assistance and Child Welfare Act of 1980, the Multiethnic Placement Act of 1994, as well as violations of the early and periodic screening, diagnosis, and treatment program of the Medicaid Act. Id. The state law claims asserted included violations of the class members' substantive due process and equal protection rights under the Georgia Constitution, violations of various Georgia statutes, and claims of nuisance, breach of contract, and inadequate and ineffective legal representation. Id. The complaint sought declaratory and injunctive relief, as well as attorneys' fees and expenses. Id. at 283 n.1.

The district court denied the defendants' motions to dismiss and for summary judgment. Kenny A. III, 454 F. Supp. 2d at 1269; Kenny A. ex rel. Winn v. Perdue, 356 F. Supp. 2d 1353, 1355 (N.D. Ga. 2005) (Kenny A. II); Kenny A. I, 218 F.R.D. at 305. It certified the class of all foster children in the Fulton and DeKalb County foster care systems, and the subgroup of African American foster children "who have had, or are subject to the risk of having, their adoption delayed or denied on the basis of their race or color," Kenny A. I, 218 F.R.D. at 305, and set the case for trial, Kenny A. III, 454 F. Supp. 2d at 1268–69.

5

At the same time, the district court referred the case to mediation. Id. at 1269. As that court would later describe it, "over the next four months the parties attended eighteen separate mediation sessions where they spent more than 110 hours trying to hammer out a settlement agreement." Id. They were eventually successful. Id.

In May 2006 the district court gave final approval to the settlement between the plaintiff class and Fulton and DeKalb Counties; the parties agreed to an attorneys' fees award in that part of the case; the district court entered that award, and it has not been appealed. This appeal arises from the settlement involving the rest of the defendants, which was approved by the district court in October 2005. Id. The court summarized that settlement this way:

> Its centerpiece is a series of thirty-one outcome measures that State Defendants have agreed to meet and sustain for at least three consecutive six-month reporting periods.
>
> The outcome measures, many of them requiring phased-in results over a two-year period, seek to improve performance in the following areas: timely commencement and thorough completion of investigations of reported abuse or neglect; regular visits of foster children by case workers; approval and licensure of foster homes and other placements; the percentage of children who are the victims of substantiated maltreatment while in foster care; the percentage of children in foster homes that exceed their licensed capacity; the percentage of children who have experienced multiple moves while in foster care; and periodic judicial reviews of the safety and status of foster children.

6

In addition, the Consent Decree requires comprehensive and periodic delivery of medical, dental, and mental health services to foster children; a detailed process for improved goal-setting, case planning and periodic reviews of children's status while in foster care; limits on the placement of children in emergency shelters and group homes and institutions, and protections against overcrowding in foster homes; and the establishment of reimbursement rates to adequately compensate providers for caring for foster children.

Moreover, State Defendants commit to reduced caseloads for all case managers and supervisors; a fully implemented single statewide automated child welfare information system; and maintaining or establishing placements and related services identified in a "needs assessment" to be conducted by a neutral expert. The settlement also includes processes for the supervision of private contract agencies that provide homes and services for foster children; improvements in foster parent screening, licensing and training, as well as foster parent support and communication; improvements in case manager training; improvements in processes for addressing suspected abuse or neglect and suspected corporal punishment of children in foster care; and improvements in efforts to maximize available federal funding.

Finally, the settlement provides that two child welfare specialists will serve as the Court's independent accountability agents charged with the responsibility of measuring and reporting publicly on the State Defendants' compliance with these and other undertakings as specified in the Consent Decree.

Id. at 1289.

The 2005 settlement agreement further acknowledged that "Plaintiff Class is entitled to recover its expenses of litigation, including reasonable attorneys' fees and nontaxable costs, pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 23(h)." The agreement said that the parties would "attempt without court intervention to

7

resolve the proper amount of Class Counsel's fees and expenses of litigation." If the parties could not reach an agreement, then "[t]he amount of any award shall be determined by the Court in accordance with the requirements of applicable law and procedures."

That is what happened. Because the parties could not agree on the amount of fees, the class filed a motion for the court to make a determination and award. Id. at 1269–70. It was accompanied by 2,500 pages of billing records, by affidavits from the two lead counsel for the class, and by affidavits from five Atlanta area attorneys who were not involved in the case. Id. at 1270, 1290. The motion sought a total of $14,342,860 in fees. Id. Half of that amount, $7,171,434.30, was to compensate the attorneys and their paralegals for the 29,908.73 hours they claimed to have worked at rates they sought; those rates ranged from $75 to $495. Id. The other $7,171,434.30 they sought was to be an enhancement of the fee award for a job well done. Id.

The defendants objected to some of the hourly rates requested and to the number of hours claimed. Id. They broke down the 2,500 pages of submitted billing records into fifteen categories of hours representing different stages of the case, and argued that in fourteen of those categories the plaintiffs' attorneys had expended more hours than was reasonably necessary to effectively represent the

8

class. Id. at 1273–74 & n.5. The defendants also argued that many of the entries on the billing records were too vague to support a claim for compensation. Id. at 1274.

As for the request that the fee award be doubled by means of a $7 million enhancement, the defendants objected, arguing that this was not one of the rare cases in which an enhancement would be appropriate. They argued that enhancing the fee based on the results obtained would be improper because the skill of the plaintiffs' attorneys in litigating the case would already have been taken into account in setting their hourly rates. Double counting the skill factor would be inappropriate, the defendants argued.

The district court overruled all of the defendants' objections to the hourly rates sought by the plaintiffs' attorneys. Id. at 1285. It granted in full each hourly rate requested, ranging from $215 to $495 for plaintiffs' attorneys, depending on their relative skill and experience. Id. at 1284–85. The court did not reduce the requested rates at all even though some of them were New York rates instead of Atlanta rates, and even though some of the attorneys (for example, Marcia Robinson Lowry, one of the two lead attorneys) recently had been awarded a smaller hourly rate for work on another case of exactly the same type. Id. at

1284–86.  Likewise, the court approved in full the requested hourly rates of $75 to $150 for paralegal work.  Id. at 1285.

The district court did partially sustain the defendants' objection to the number of hours that the plaintiffs' attorneys claimed to have worked on the case. Id. at 1274.  The court agreed with the defendants that some of the entries on counsel's billing records were vague and that the hours claimed for eight of the fifteen billing categories were excessive.  Those eight excessively billed categories were:  (1) preparing the complaint and mandatory disclosures; (2) litigating the preliminary injunction motion; (3) producing and analyzing documents; (3) litigating discovery motions; (4) conferencing with each other; (5) preparing expert witness reports; (6) responding to the summary judgment motion; (7) preparing for trial; and (8) travel.  Id. at 1274–84, 1286.

The court dealt with the vague and excessive billing two ways, one for the non-travel hours and the other for travel hours.  It made "an across-the-board 15% reduction in the number of non-travel related hours claimed by plaintiffs' counsel." Id. at 1286.  This 15 percent reduction amounted to 4,371.22 hours being sliced off the 29,141.46 total number of non-travel hours for which the attorneys had requested compensation.  In dollar terms, that amounted to a reduction of $1,040,176.92 in non-travel related attorneys' fees.  To remedy the vagueness and

excessive billing problem as it related to travel hours, the court halved the hourly rate, thereby effectively halving the number of travel hours that were compensated from 767.27 to 383.64, which amounted to a reduction of $118,460.75. When travel and non-travel fees are considered together, the court reduced the overall $7,171,434.30 fee request by $1,158,631.40, which amounted to an overall reduction of 16 percent. After the reductions, the total award was $6,012,802.90 before enhancement. Id.

On the applicability of an enhancement to the fee request, the court overruled the defendants' objections. Id. at 1288. The court found that the plaintiffs' attorneys were entitled to an enhancement because their hourly rate did "not take into account (1) the fact that class counsel were required to advance case expenses of $1.7 million over a three-year period with no ongoing reimbursement, (2) the fact that class counsel were not paid on an on-going basis as the work was being performed, and (3) the fact that class counsel's ability to recover a fee and expense reimbursement were completely contingent on the outcome of the case." Id. (footnote omitted).

The district court also found that "the superb quality of [counsel's] representation far exceeded what could reasonably be expected for the standard hourly rates used to calculate the [fee]." Id. at 1288–89. The court commented

11

that "[q]uite simply, plaintiffs' counsel brought a higher degree of skill, commitment, dedication, and professionalism to this litigation than the Court has seen displayed by the attorneys in any other case during its 27 years on the bench." Id. at 1289. Finally, the court said that an enhancement was appropriate because "the evidence establishes that plaintiffs' success in this case was truly exceptional." Id.

For these reasons, and based on the affidavits of some Atlanta area attorneys urging the court to enhance the fee award (even more than it did), the court multiplied the $6,012,802.90 fee award by 1.75, thereby enhancing it by 75 percent or $4,509,602.00. Id. at 1290. That enhancement boosted the total fee award to $10,522,405.08. Id.

## II.

In reviewing the decisions of the district court raised in this appeal and cross-appeal, we look at questions of law anew but we review the court's findings of fact only for clear error. Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 442 F.3d 1283, 1287 (11th Cir. 2006). The abuse of discretion standard applies to the district court's determination of the number of compensable billable hours, the hourly rate at which plaintiffs' counsel is compensated, the award of costs and expenses, and the enhancement decision. See Am. Civil

12

Liberties Union of Ga. v. Barnes, 168 F.3d 423, 439 (11th Cir. 1999); Richardson v. Ala. State Bd. of Educ., 935 F.2d 1240, 1248–49 (11th Cir. 1991). In applying the abuse of discretion standard, we keep in mind that "[w]hen a district court has discretion, there are usually a range of choices it may make and still be affirmed; there is not only one right choice for the court to make." Blasland, Bouck & Lee, Inc. v. City of N. Miami, 283 F.3d 1286, 1298 (11th Cir. 2002); McMahan v. Toto, 256 F.3d 1120, 1128 (11th Cir. 2001) (same). This is true "even though we would have gone the other way had it been our call." Rasbury v. Internal Revenue Serv., 24 F.3d 159, 168 (11th Cir. 1994).

Of course, "[a] district court by definition abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996); accord Schlup v. Delo, 513 U.S. 298, 333, 115 S. Ct. 851, 870 (1995) (O'Connor, J., concurring) ("It is a paradigmatic abuse of discretion for a court to base its judgment on an erroneous view of the law."). We may also find an abuse of discretion if the district court failed to follow proper procedures in making its determination, based an award upon findings of fact that are clearly erroneous, or committed a clear error of judgment. Johnson v. Breeden, 280 F.3d 1308, 1326 (11th Cir. 2002); SunAmerica Corp. v. Sun Life Assurance Co. of Can., 77 F.3d

13

1325, 1333 (11th Cir. 1996); BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1048 (11th Cir. 1994).

## III.

In their cross-appeal the plaintiffs contend that the district court abused its discretion in two respects: (1) by not applying the common fund and common benefit doctrines, which would have resulted in a fee award substantially higher than the one they received; and (2) by not compensating them for the $801,864.40 they spent on expert witness expenses. The district court resolved each of those two issues correctly, and we affirm its decision of them on the basis of the reasoning contained in its opinion. Kenny A. III, 454 F. Supp. 2d at 1270–72, 1291–92.

## IV.

The defendants conceded in the settlement agreement that the class had prevailed in the litigation and was entitled to recover reasonable attorneys' fees under 42 U.S.C. § 1988. That section provides in relevant part that in any action, like this one, where the plaintiffs seek to enforce their constitutional rights under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

In their appeal the defendants contend that the district court abused its discretion in three ways. Their first contention is that the district court should not have awarded the plaintiffs' attorneys all of the photocopying expenses they claimed. See Kenny A. III, 454 F. Supp. 2d at 1294–95. Although we probably would not award the full amount of the claimed expenses if we were deciding the matter in the first instance, we cannot say that the district court abused its discretion in doing so.

## V.

We turn now to the defendants' other contentions, starting with their argument that the district court erred in calculating the lodestar amount. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983). The product of this formula is the "lodestar," Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994) (per curiam), which is "the guiding light of our fee-shifting jurisprudence." City of Burlington v. Dague, 505 U.S. 557, 562, 112 S. Ct. 2638, 2641 (1992).

Although the defendants no longer contest the hourly rate component of the district court's lodestar calculation,[2] they do contend that the district court compensated the plaintiffs' attorneys for an unreasonable number of hours. As we have already explained, the court essentially cut the total number of hours submitted by 16 percent because of vague entries and excessive billing. See supra at 10–11. We have held that where the billing records are voluminous, as they are here, a district court may make a reasonable across the board reduction in hours instead of engaging in the pick and shovel work necessary to make a more precise determination. See Loranger, 10 F.3d at 783. Even so, the defendants argue, the district court's cut was unreasonably shallow—it should have cut much deeper.

The district court's reduction of only 16 percent in the submitted hours does appear charitable, maybe even excessively so, in favor of the plaintiffs' attorneys, but we are not quite convinced that it was a clear error of judgment, which is what we would have to conclude in order to find an abuse of discretion. See Johnson, 280 F.3d at 1326; SunAmerica Corp., 77 F.3d at 1333; BankAtlantic, 12 F.3d at 1048. Even though we would have cut the billable hours more if we were deciding the matter in the first instance, we cannot say that the result the district court

---

[2] The defendants did object in the district court that the hourly rates requested were too high, but they have not raised that as an issue on appeal. Accordingly, we have no occasion to pass on that matter, but we do not mean to imply approval of those hourly rates, which appear to be on the generous side.

reached was outside the range of permissible choices on this record.  See Cook ex

rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1103–1104

(11th Cir. 2005); Cooper v. Southern Co., 390 F.3d 695, 711–12 (11th Cir. 2004);

Rasbury, 24 F.3d at 168.

## VI.[3]

The defendants' final contention is that the district court should not have

granted plaintiffs' attorneys a $4.5 million enhancement to the $6 million dollar

lodestar amount.  That contention can claim the favor of a presumption, and not a

weak one either.  The Supreme Court has instructed us that there is a "strong

presumption" that the lodestar figure, without any adjustment, is the reasonable fee

award.  Dague, 505 U.S. at 562, 112 S. Ct. at 2641; Pennsylvania v. Del. Valley

Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S. Ct. 3088, 3098 (1986)

(Delaware Valley I).  That strong presumption can be rebutted only in "rare" and

"exceptional" cases, Delaware Valley I, 478 U.S. at 565, 106 S. Ct. at 3098, where

the fee applicant has shown that without an upward adjustment of the lodestar

amount the fee would be unreasonable, Dague, 505 U.S. at 562, 112 S. Ct. at 2641.

---

[3] The views expressed in Parts I–V and Part VII of this opinion represent the views of a majority of the Court, consisting of Judges Carnes and Hill.  The views expressed in this part, Part VI, of this opinion represent the views of the author of this opinion alone.  The views of Judge Hill on the question addressed in this part are expressed in his separate concurring opinion. The views of Judge Wilson are expressed in his separate concurring opinion.

Even in the rare and exceptional case where an enhancement is permissible, it must be "supported by both 'specific evidence' on the record and detailed findings by the lower court." Delaware Valley I, 478 U.S. at 565, 106 S. Ct. at 3098.

## A.

In order to appreciate just how rare and exceptional a case must be for an enhancement of the lodestar amount to be permissible these days, a review of the evolution of Supreme Court thinking in this area is necessary. The history of the issue is one of early, tentative statements indicating more receptiveness to enhancements than the statements and holdings of later decisions actually permit. Suggestion has been followed by retrenchment, resulting in a decisional arc that bends decidedly against enhancements.

Hensley, a 1983 decision, was the Court's first stab at interpreting what Congress meant by a "reasonable fee" under § 1988 and similar fee-shifting statutes. In that case the Court adopted the lodestar method for calculating fees. Hensley, 461 U.S. at 433–34, 103 S. Ct. at 1939–40. In doing so, the Court said that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Id. at 433, 103 S. Ct. at 1939. It added, however, that this "does not end the inquiry," because "[t]here remain other considerations that may

18

lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" Id. at 434, 103 S. Ct. at 1940.  The context in which that statement was made, however, was not one of upward enhancement.

Instead, the actual adjustment issue decided in Hensley was whether the lodestar figure should be reduced for plaintiffs who have achieved only partial or limited success.  See id. at 426, 103 S. Ct. at 1935–36 ("The issue in this case is whether a partially prevailing plaintiff may recover an attorney's fee for legal services on unsuccessful claims."); see also id. at 434–37, 103 S. Ct. at 1940–41. The Court decided that the fees should be reduced by the amount spent on claims that do not succeed.  Id. at 440, 103 S. Ct. at 1943 ("Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee."); see also id. ("[W]here the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.").  Even though the issue of enhancements was not presented in Hensley, the opinion does contain this dicta: "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably

19

expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." Id. at 435, 103 S. Ct. at 1940. The use of "may be" instead of "will be" was a harbinger of decisions to come.

The next term the Supreme Court decided Blum v. Stenson, 465 U.S. 886, 104 S. Ct. 1541 (1984), which, unlike Hensley, was a case in which the district court had actually awarded an enhancement. Id. at 891, 104 S. Ct. at 1545. The court had enhanced the lodestar figure by 50 percent "because of the quality of representation, the complexity of the issues, the riskiness of success, and the great benefit to the large class that was achieved." Id. (quotation omitted). Unimpressed with that reasoning, the Supreme Court held that awarding the enhancement was an abuse of discretion. Id. at 896–902, 104 S. Ct. at 1547–50.

While repeating the Hensley opinion's statement that "in some cases of exceptional success an enhanced award may be justified," id. at 897, 104 S. Ct. at 1548 (quotation omitted), the Blum Court qualified that possibility with the statement that the lodestar amount "is presumed to be the reasonable fee contemplated by § 1988." Id. The Court then considered and rejected each of the district court's four justifications for the enhancement. It began:

> The novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment in a fee based on the number of billable hours times reasonable hourly rates. There may be cases, of

20

course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates. Neither complexity nor novelty of the issues, therefore, is an appropriate factor in determining whether to increase the basic fee award.

Id. at 898–99, 104 S. Ct. at 1549.

The Blum Court then moved on to the next factor:

The "quality of representation" . . . generally is reflected in the reasonable hourly rate. It, therefore, may [note the use, again, of the word "may" instead of "will"] justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."

Id. at 899, 104 S. Ct. at 1549 (words in brackets added). Otherwise, the Court said, "an upward adjustment for quality of representation is a clear example of double counting." Id. The Court found the district court's opinion that "[t]he quality of work performed by counsel throughout this case was high," without any specific evidence to support it, insufficient to justify the enhancement. Id. at 899–90, 104 S. Ct. at 1549 (quotation omitted).

Regarding the results obtained factor, the Court reasoned that successful results are to be considered when calculating counsel's hourly rate. Id. at 900, 104 S. Ct. at 1549–50. "Because acknowledgment of the 'results obtained' generally

21

will be subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee award." Id. (footnote omitted).

The Blum Court left for another day the question of whether the risk borne by the plaintiffs' counsel in taking the case on a contingency basis could ever justify an enhancement of the lodestar. Id. at 901 n.17, 104 S. Ct. at 1550 n.17. Assuming that it could, however, the Court said that the record did not identify any specific risks to counsel in that case. Id. at 901, 104 S. Ct. at 1550. Accordingly, the Court vacated the portion of the district court's order enhancing the plaintiffs' fees award. Id. at 901–02, 104 S. Ct. at 1550.

The Court's next "reasonable fee" case was Delaware Valley I.[4] The district court had enhanced the plaintiffs' lodestar calculation in that case because of the contingent nature of the fee and the quality of counsel's work "which culminated in an outstanding result." Delaware Valley I, 478 U.S. at 555, 106 S. Ct. at 3093 (quotation omitted). As it had done in Blum, the Delaware Valley I Court reviewed the district court's reasons for enhancing the fee award and found all of

---

[4] In Delaware Valley I, the Court reviewed an attorneys' fees award that was ordered pursuant to the Clean Air Act § 304(d), 42 U.S.C. § 7604(d). Delaware Valley I, 478 U.S. at 557, 106 S. Ct. at 3094. The Court held that "[g]iven the common purpose of both § 304(d) and § 1988 to promote citizen enforcement of important federal policies, we find no reason not to interpret both provisions governing attorney's fees in the same manner." Id. at 560, 106 S. Ct. at 3096. Delaware Valley I has been applied to § 1988 cases by this Court, as well. See, e.g., Norman v. Housing Auth. of Montgomery, 836 F.2d 1292, 1298–99 (11th Cir. 1988).

22

them wanting. This time the Court did not just say that there's a presumption, but emphasized that there is a "strong presumption" that the lodestar figure represents the reasonable fee. Id. at 565, 106 S. Ct. at 3098. The Court explained the basis for that strong presumption:

> A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a "reasonable" fee is wholly consistent with the rationale behind the usual fee-shifting statute, including the one in the present case. These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws. Hence, if plaintiffs, such as Delaware Valley, find it possible to engage a lawyer based on the statutory assurance that he will be paid a "reasonable fee," the purpose behind the fee-shifting statute has been satisfied.

Id.

The Court in Delaware Valley I closed some doors for enhancements that it had left ajar in earlier cases. It held that the strong presumption that the lodestar figure is the amount to be awarded—the presumption against enhancements—cannot be overcome by the special skill and experience of counsel, the quality of representation, or the results obtained. Id. Those factors, the Court reasoned, "are presumably fully reflected in the lodestar amount, and thus cannot

23

serve as independent bases for increasing the basic fee award." Id. This is the

Court's reasoning:

> [W]hen an attorney first accepts a case and agrees to represent the
> client, he obligates himself to perform to the best of his ability and to
> produce the best possible results commensurate with his skill and his
> client's interests. Calculating the fee award in a manner that accounts
> for these factors, either in determining the reasonable number of hours
> expended on the litigation or in setting the reasonable hourly rate, thus
> adequately compensates the attorney, and leaves very little room for
> enhancing the award based on his post-engagement performance. In
> short, the lodestar figure includes most, if not all, of the relevant
> factors constituting a "reasonable" attorney's fee, and it is unnecessary
> to enhance the fee for superior performance in order to serve the
> statutory purpose of enabling plaintiffs to secure legal assistance.

Id. at 565–66, 106 S. Ct. at 3098. Not using the overall quality of performance to

enhance the fee removes "any danger of 'double counting.'" Id. at 566, 106 S. Ct.

at 3099.

The Delaware Valley I Court reversed the enhancement part of the fee award

insofar as the enhancement was based on the quality of the attorney's work and the

outstanding result obtained. Id. at 568, 106 S. Ct. at 3099–100. It left undecided

the question of whether the enhancement was proper insofar as it was based on the

contingency nature of the fee—the risk that the attorneys would lose the case and

receive no fees. That issue was to be reargued in the same case the next term, id.,

106 S. Ct. at 3100, but that attempt to decide it misfired when the Court fractured,

24

with no opinion garnering a majority vote.  See Pennsylvania v. Del. Valley

Citizens' Council for Clean Air, 483 U.S. 711, 107 S. Ct. 3078 (1987) (Delaware

Valley II).

It was not until five years later, after the membership of the Court had

changed, that the contingency issue was definitively resolved.  In Dague the Court

squarely rejected the proposition that a court "may enhance the fee award above the

'lodestar' amount in order to reflect the fact that the party's attorneys were retained

on a contingent-fee basis and thus assumed the risk of receiving no payment at all

for their services."  Dague, 505 U.S. at 559, 112 S. Ct. at 2639.[5]  The Court

reasoned that an enhancement for contingency would duplicate in substantial part

factors that had already been considered in arriving at the lodestar.  It explained

that "[t]he risk of loss in a particular case (and, therefore, the attorney's contingent

risk) is the product of two factors:  (1) the legal and factual merits of the claim, and

(2) the difficulty of establishing those merits."  Id. at 562, 112 S. Ct. at 2641.

---

[5]  The fees in Dague were awarded pursuant to the Solid Waste Disposal Act § 7002(e), 42 U.S.C. § 6972(e), and the Clean Water Act § 505(d), 33 U.S.C. § 1365(d).  Dague, 505 U.S. at 559, 112 S. Ct. at 2639.  As it had in Delaware Valley I, the Dague Court held that the language of these attorneys' fees statutes are "similar to that of many other federal fee-shifting statutes; our case law construing what is a 'reasonable' fee applies uniformly to all of them."  Id. at 562, 112 S. Ct. at 2641 (citing 42 U.S.C. § 1988).

The second factor, the Court said, is "ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." Id. "Taking account of it again through lodestar enhancement amounts to double counting." Id. at 563, 112 S. Ct. at 2641.

The Court recognized that, unlike the second contingency factor, the first one—the relative merits of the claim—is not taken into consideration in determining the lodestar figure. That is no problem, the Court decided, because the relative merits of the claim "should play no part in the calculation of the award." Id. For one thing, there is always a risk that a case will be lost—"no claim has a 100% chance of success." Id. As a result, permitting adjustments based on risk would mean that the "computation of the lodestar would never end the court's inquiry in contingent-fee cases." Id. That would contradict the Court's repeated instruction that there is a strong presumption that the lodestar is the fee to be awarded and adjustments to it are to be the rare exception, not the general rule.

Not only that, the Court said, but awarding enhancements based on the financial risk in taking the case would also "provide attorneys with the same incentive to bring relatively meritless claims as relatively meritorious ones." Id. The "social cost of indiscriminately encouraging nonmeritorious claims" would be

too high, and encouraging attorneys to take less meritorious cases is "an unlikely objective of the 'reasonable fees' provisions." Id. at 563, 112 S. Ct. at 2642. Accordingly, the Court concluded that a contingency enhancement is "not consistent with our general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee." Id. at 566, 112 S. Ct. at 2643. The Court in Dague did not merely reverse the application of a contingency or risk enhancement in that case, but also ruled out one in any case, "concluding that no contingency enhancement whatever is compatible with the fee-shifting statutes at issue." Id. at 565, 112 S. Ct. at 2643.

The Dague decision is the last word we have from the Supreme Court on the issue of whether, and if so when, the lodestar amount may be enhanced in calculating the attorneys' fees under one of the federal fee-shifting statutes.

**B.**

The district court's $4.5 million enhancement to the $6 million lodestar figure in the present case cannot be squared with the Supreme Court decisions we have discussed. The district court did not explicitly mention, much less give full effect to, the strong presumption that the lodestar amount is a reasonable fee and therefore the fee to be awarded. See Dague, 505 U.S. at 562, 112 S. Ct. at 2641 ("We have established a strong presumption that the lodestar represents the

27

reasonable fee, and have placed upon the fee applicant who seeks more than that

the burden of showing that such an adjustment is <u>necessary</u> to the determination of

a reasonable fee." (quotation and citation omitted)); <u>Delaware Valley I</u>, 478 U.S. at

565, 106 S. Ct. at 3098 ("A strong presumption that the lodestar figure—the

product of reasonable hours times a reasonable rate—represents a 'reasonable' fee

is wholly consistent with the rationale behind the usual fee-shifting statute,

including the one in the present case.").

The district court relied on several factors in granting the multi-million

dollar enhancement to the lodestar figure, most of which are cited in the following

passage from its opinion:

> First, the evidence establishes that the quality of service rendered by class counsel, including their extraordinary commitment of capital resources, was far superior to what consumers of legal services in the legal marketplace in Atlanta could reasonably expect to receive for the rates used in the lodestar calculation. Specifically, the evidence shows that the hourly rates used in the lodestar calculation do not take into account (1) the fact that class counsel were required to advance case expenses of $1.7 million over a three-year period with no ongoing reimbursement, (2) the fact that class counsel were not paid on an on-going basis as the work was being performed, and (3) the fact that class counsel's ability to recover a fee and expense reimbursement were completely contingent on the outcome of the case.FN8 (Chandler Decl. ¶¶ 5–8; Fellows Decl. ¶¶ 5–8; Knowles Decl. ¶¶ 7–12; Rawls Decl. ¶¶ 5–8; Lowry Decl. ¶ 25; Bramlett Decl. ¶¶ 7(a) & 10, 13–14.)

> > FN8. A lodestar enhancement cannot be based on contingency alone. <u>City of Burlington v. Dague</u>, 505 U.S.

28

> 557, 112 S. Ct. 2638 (1992).  In this case, however, the
> risk of nonrecovery is only one of several factors which,
> taken together, establish a level of service well beyond
> what could reasonably be expected for the rates claimed.

Kenny A., 454 F. Supp. 2d at 1288 (citations omitted).  None of the three factors

the district court relied on in that passage to justify boosting the award is a proper

basis for doing so.

1.

Starting from the end of the list, the district court's reliance on the quality of

service and superior performance, which are essentially the same thing, conflicts

with the Supreme Court's teachings that those considerations are adequately

accounted for "either in determining the reasonable number of hours expended on

the litigation or in setting the reasonable hourly rates," and that it is "unnecessary

to enhance the fee for superior performance in order to serve the statutory purpose

of enabling plaintiffs to secure legal assistance."  Delaware Valley I, 478 U.S. at

565–66, 106 S. Ct. at 3098; see also id. at 565, 106 S. Ct. at 3098 ("Hence, if

plaintiffs . . . find it possible to engage a lawyer based on the statutory assurance

that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute

has been satisfied.").  In this case, the district court specifically considered "the

stellar performance of plaintiffs' counsel throughout this long and difficult case" in

29

approving their hourly rates, which reached $450 and $495 for lead counsel. Kenny A. III, 454 F. Supp. 2d at 1284, 1286. Having already been used to increase the lodestar amount, the quality of the services rendered and superior performance could not also be used to enhance the lodestar amount that had been calculated using those higher rates. See Delaware Valley I, 478 U.S. at 565, 106 S. Ct. at 3098. Double counting simply is not allowed.

It was after the successful settlement had been achieved, after they knew how well they had performed, after they knew the degree of difficulty involved, and after they knew how much capital resources and legal effort had been required that the plaintiffs' attorneys asked for hourly rates they thought that they deserved. Over the objections of the defendants, the district court gave them those rates in full. It did not reduce a single hourly rate for any attorney or paralegal by so much as a penny.[6]

In requesting their hourly rates, the lead counsel for the plaintiffs represented that those rates were adequate, subject to considerations they specified, to compensate them. Marcia Robinson Lowry, one of the two lead counsel, testified by affidavit that:

---

[6] The district court did cut the hourly rates for travel time in half, but not in order to lower the rates. Instead, the reduction was the court's way of correcting for the attorneys' excessive billing of time. Kenny A. III, 454 F. Supp. 2d at 1284.

30

The standard hourly rates reflected in Exhibit 2 are fair, reasonable, and consistent with hourly rates in the Atlanta market for the price of legal services of comparable quality rendered in cases demanding similar skill, judgment and performance. These standard hourly rates do not, however, take into account the fact that class counsel was required in this case to advance the entire $1.7 million expense of prosecuting this case for the benefit of the class, or the fact that class counsel's compensation was totally contingent upon prevailing in this action.

Jeffrey O. Bramlett, the other lead counsel, testified by affidavit that: "The hourly rates set forth in Exhibit 1 correctly reflect the hourly rates my law firm currently charges and collects from clients who hire us to perform legal services on a Standard Hourly Rate basis." However, he further testified:

Standard Hourly Rates are predicated on the assumptions that the client will pay in full on a 30–60 day cycle, that counsel is not required to shoulder any significant financial risk of unreimbursed case expense, and that counsel will be paid currently regardless of the result ultimately achieved. Here, Class Counsel was forced to advance case expenses approaching $1.7 million to protect the Class' interests, largely because State Defendants refused Plaintiffs' suggestion of a neutral case record review that would have saved both sides (and ultimately the State) duplicative cost. Here, Class Counsel was forced to personally advance Plaintiffs' portion of that cost in the face of State Defendants' vigorous assertion that it would not and could not be recovered. Here, Class Counsel's recovery of any cost, let alone fee, was utterly dependent upon the contingency of a successful result. Here, Class Counsel was forced to invest more than $8.85 million of professional time and out-of-pocket expense over a three-and-one-half year period with no assurance of any recovery.

There is no indication that Mr. Bramlett's firm's regular hourly rates are anywhere near the low side of the Atlanta legal market or even the midpoint.

The position that the two lead counsel took in their affidavits is that the hourly rates used to calculate the lodestar figure were the same rates paying clients would have been charged. They each represented that those rates would fully compensate them except for three facts that the district court listed in its opinion: "(1) the fact that class counsel were required to advance case expenses of $1.7 million over a three-year period with no ongoing reimbursement, (2) the fact that class counsel were not paid on an on-going basis as the work was being performed, and (3) the fact that class counsel's ability to recover a fee and expense reimbursement were completely contingent on the outcome of the case." Kenny A. III, 454 F. Supp. 2d at 1288.

2.

The first two of those three considerations are delayed payment factors, and if they were permissible bases for enhancing a fee award, an enhancement would be required in virtually every class action covered by one of the traditional federal fee-shifting statutes. It is a rare § 1983 action where those whose rights have been violated finance the cost of the litigation. Attorneys for the plaintiffs in these types of cases almost always have to advance the cost of the litigation and do not receive any payment for their time until the case is completed. That is simply the nature of the beast. If the delays in reimbursement for costs and payment for services that

these cases inevitably entail justified enhancement, there would be an enhancement in almost every case. We know that cannot be, because the Supreme Court has instructed us that we must employ a strong presumption against enhancements and confine them to the rare and exceptional case. Dague, 505 U.S. at 562, 112 S. Ct. at 2641; Delaware Valley I, 478 U.S. at 565, 106 S. Ct. at 3098.

Particularly instructive on this point is some of the Supreme Court's reasoning in concluding that there could be no enhancement for the contingency nature of a case—for the risk that the plaintiffs would not be paid at all for the costs they advanced and the time they expended. See Dague, 505 U.S. at 563, 112 S. Ct. at 2641. Because there is always a risk that a case will be lost, permitting enhancements based on the degree of risk would mean that calculation of the lodestar would never end the inquiry in a contingent-fee case, and that, the Court decided, would be unacceptable. Id. Likewise, permitting enhancements for the delay in compensation for expenses incurred and services rendered would mean that calculation of the lodestar would be merely the first step, not the presumptive last step in the process. That would be unacceptable.

Finally, we have said that any delay in payment for professional services rendered is offset by the fact that the hourly rates used are those that prevail at the completion of the case instead of the usually lower rates that were in effect at the

33

time the earlier work was done.  See Norman, 836 F.2d at 1302 ("[W]here there is a delay the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than at historic rates.").  In this case, as in most, the hourly rates used were those in effect after the case had been completed.  (See R32:495:Ex.C:¶6) ("The hourly rates set forth in Exhibit 1 correctly reflect the hourly rates my firm currently charges and collects from clients who hire us to perform legal services on a Standard Hourly Rate basis.").  That covers two of the three factors the district court relied on in determining that the hourly rates were underinclusive and an enhancement was warranted.  Kenny A. III, 454 F. Supp. 2d at 1288.

3.

The third factor was the contingent nature of the case.  Enhancing a lodestar based on contingency is flatly forbidden by the Dague decision.  The district court was under the mistaken impression that the Dague rule forbids only an enhancement based on contingency alone.  Id. at 1288 n.8.  The rule is not so limited.  The Supreme Court's description of the scope of its holding leaves no wiggle room.  The Court stated that it was "concluding that no contingency enhancement whatever is compatible with the fee-shifting statutes at issue."  Dague, 505 U.S. at 565, 112 S. Ct. at 2643.  In case anyone missed the point of

34

that, the Court unequivocally stated in the penultimate sentence of its opinion: "[W]e hold that enhancement for contingency is not permitted under the fee-shifting statutes at issue." Id. at 567, 112 S. Ct. at 2643–44. Period.

Even if we were to go beyond that clear language of the Supreme Court's command, the reasons it gave for concluding that contingency enhancements are incompatible with the fee-shifting statutes apply with equal force to using contingency as one of several reasons for an enhancement. For example, taking the risk of loss into account both in the lodestar and in an enhancement amounts to double counting the difficulty of the case, id. at 562–63, 112 S. Ct. at 2641, regardless of whether contingency is the sole enhancement factor. No double counting means no double counting. Allowing contingency to figure into an enhancement to any extent would also provide attorneys with an incentive to bring relatively meritless claims. See id. at 563, 112 S. Ct. at 2642; see also id. at 566, 112 S. Ct. at 2643 ("Contingency enhancement would make the setting of fees more complex and arbitrary, hence more unpredictable, and hence more litigable."). That, the Court reasoned, would be bad. Dague, 505 U.S. at 566, 112 S. Ct. at 2643.

In summary, none of the three factors that the district court enumerated as a basis for determining that the professional services rendered by plaintiffs' counsel

were "far superior to what consumers of legal services in the legal marketplace in Atlanta could reasonably expect to receive for the rates used in the lodestar calculation," Kenny A. III, 454 F. Supp. 2d at 1288, is a permissible basis for enhancing the lodestar amount. An enhancement based on them is inconsistent with controlling Supreme Court decisions.

4.

Making a further attempt to justify the enhancement, the district court also stated that:

> In addition, based on its personal observation of plaintiffs' counsel's performance throughout this litigation, the Court finds that the superb quality of their representation far exceeded what could reasonably be expected for the standard hourly rates used to calculate the lodestar. Quite simply, plaintiffs' counsel brought a higher degree of skill, commitment, dedication, and professionalism to this litigation than the Court has seen displayed by the attorneys in any other case during its 27 years on the bench. The foster children of Fulton and DeKalb Counties were indeed fortunate to have such unparalleled legal representation, and the Court would be remiss if it failed to compensate counsel for this extraordinary level of service to their clients.

Id. at 1288–89. This rationale is little more than a restatement of the district court's position that the lodestar amount should be enhanced because of the quality of the representation. Two points about that.

First, the district court itself found that plaintiffs' attorneys had submitted vague records and overbilled in eight of fifteen categories, forcing the court to cut

36

more than 4,700 hours off those they claimed, amounting to a reduction of more than $1 million of billable time. See supra at 10–11. And, as we have indicated, if anything, the district court was too kind to plaintiffs' attorneys in that respect. See supra at 15–17. Any kindness aside, in Delaware Valley I the Supreme Court held that the "elimination of a large number of hours on the grounds that they were unnecessary, unreasonable, or unproductive is not supportive of the court's later conclusion that the remaining hours represented work of 'superior quality.'" Delaware Valley I, 478 U.S. at 567, 106 S. Ct. at 3099; see generally id. at 554 n.2, 106 S. Ct. at 3093 n.2. The holding reflects the common sense idea that bad and excessive billing is inconsistent with superb lawyering. The district court failed to consider that inconsistency in its findings.

The second, and more fundamental, point about the district court's reliance on the quality of the representation as a ground for enhancing the lodestar amount is that it amounts to double counting and is contrary to the Supreme Court's decision in Delaware Valley I. As we have already explained, in that decision the Court reversed an enhancement for superior performance, holding that "the special skill and experience of counsel" and "the quality of representation" are "presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award." Delaware Valley I, 478

37

U.S. at 565, 106 S. Ct. at 3098 (quotation and citation omitted); see also id. at 566, 106 S. Ct. at 3098 ("In short, the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." (emphasis added)).[7]

The final reason the district court gave for the $4.5 million enhancement was that "plaintiffs' success in this case was truly exceptional." Kenny A. III, 454 F. Supp. 2d at 1289. The result was so good, the court said, that: "After 58 years as a practicing attorney and federal judge, the Court is unaware of any other case in which a plaintiff class has achieved such a favorable result on such a comprehensive scale." Id. at 1290. Not only that, but the district court also said that "even if the plaintiffs had prevailed in a trial of this case, it is doubtful that

_____

[7] The Court in Delaware Valley I also said that "[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate, the overall quality of performance ordinarily should not be used to adjust the lodestar, thus removing any danger of 'double counting.'" Delaware Valley I, 478 U.S. at 566, 106 S. Ct. at 3099. Judge Wilson's concurring opinion reads the words "normally" and "ordinarily" to eviscerate the Court's clear instruction that "it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." Id. That reading, which infers too much from two words, would license courts to award enhancements for superior performance or results in any case where the performance or result was anything better than "ordinary" or "normal," thereby contradicting the Court's clear instruction that there is a strong presumption against an enhancement for any reason and that they should rarely be granted for any reason. Id. at 565, 106 S. Ct. at 3098. That reading would also be inconsistent with much of what the Court has said on the subject, contradicting, for example, the clear implication of the Court's later teachings in the Dague case. See infra at 40–42.

38

they would have obtained relief as 'intricately detailed and comprehensive' as that contained in the Consent Decree." Id. at 1289–90.

To the extent that the district court rewarded plaintiffs' counsel with an enhancement for obtaining better results than the class would have received had the case been resolved on the merits, that is plainly wrong. The purpose of the fee-shifting statutes, as the Supreme Court explained in Delaware Valley I, is "to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws." Delaware Valley I, 478 U.S. at 565, 106 S. Ct. at 3098. The statutes are designed to ensure that civil rights plaintiffs are adequately represented by counsel. See Hensley, 461 U.S. at 429, 103 S. Ct. at 1937 ("The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." (quoting H.R. Rep. No. 94-1558, at 1 (1976))). For that reason, a fee award should "result[] in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys." Blum, 465 U.S. at 893–94, 104 S. Ct. at 1546 (quoting S. Rep. No. 94-1011, at 6 (1976), reprinted in 1976 U.S.C.A.A.N. 5908, 5913).

Stated from the other direction, the fee-shifting statutes are not designed to provide representation that will win plaintiffs more than a correct application of substantive and remedial law entitles them to receive. Their purpose is not to

39

provide representation that will secure settlement relief that is more "intricately

detailed and comprehensive," Kenny A. III, 454 F. Supp. 2d at 1289–90, than the

plaintiffs would have received if their claims had been litigated to final judgment.

The purpose of the statutes, most assuredly, is not to provide plaintiffs with

representation that dazzles or bedazzles the district court judge. Fee awards should

be calculated in a way that furthers the purpose of the fee-shifting statutes; they

should not be used to encourage or reward results that go beyond that purpose. See

Blum, 465 U.S. at 893–95, 104 S. Ct. at 1546–47.

Some of the discussion in the Dague opinion is useful in understanding why

enhancements should not be given for merits-exceeding results. As we have

recounted, in that case the Supreme Court rejected the idea of enhancements for

contingency or risk of loss in part because permitting them would provide attorneys

with some incentive to bring relatively meritless claims. Dague, 505 U.S. at 563,

112 S. Ct. at 2641–42. The social cost of encouraging attorneys to press claims of

dubious merit would be too high, the Court reasoned, and providing attorneys with

incentives to bring them is "an unlikely objective of the 'reasonable fees'

provision." Id. at 563, 112 S. Ct. at 2643.

A result that obtains more or better relief than plaintiffs are entitled to

receive under the law is, to the extent it exceeds their entitlement on the merits,

analogous to relief on a meritless claim. Just as <u>Dague</u> instructs us that fee awards should not underwrite efforts to obtain relief where none is due under the law, neither should they underwrite efforts to receive more or better relief than that due under the law. Just as the societal costs for fee awards for non-meritorious claims are too high, so also are they too high for results that exceed what the law allows. Just as encouraging non-meritorious claims cannot have been an objective of the fee-shifting provisions, neither can encouraging results that go beyond what the law allows have been an objective.

To put it in an either-or manner, superb results are either what a fair application of the law produces, which means that they are not truly "superb," or they are results that exceed what the law allows and for that reason are beyond the purpose of the fee-shifting statutes. Those statutes are designed to provide a reasonable fee for a reasonable result, not an extraordinary fee for a result that goes beyond what the law would provide if the claims were litigated to their correct conclusion on the merits.

Look at it this way. A merits-exceeding result for plaintiffs must be the product of one, or some combination, of the following factors: superior lawyering by plaintiffs' counsel, bad lawyering by defendants' counsel, poor decision making by the court, or dumb luck. The Supreme Court held in <u>Delaware Valley I</u> that

superior lawyering by the plaintiffs' counsel is not a proper basis for an enhancement. Delaware Valley I, 478 U.S. at 565–68, 106 S. Ct. at 3098–100. So, the first possible cause of results that go beyond the merits cannot be used to justify an enhancement. Nor can it plausibly be argued that plaintiffs' attorneys ought to reap a windfall, and defendants ought to have to pay more in fees than they otherwise should, because of bad lawyering on the defense side. Surely a defendant suffers enough from the additional relief granted against it because of inferior representation without making the defendant pay a surcharge to the other side for the privilege of having been the victim of bad lawyering. Nor can it be argued, with tongue out of cheek, that fees should be increased to reward plaintiffs' attorneys for being on the side that happens to benefit from bad judging or good luck. That exhausts the possible explanations for excessively favorable results, and none supports awarding an enhancement.

5.

The district court relied to some extent on four of the five affidavits that the plaintiffs' attorneys in this case obtained from their friends who do similar work. Kenny A. III, 454 F. Supp. 2d at 1290.[8] The district court found that the affiants

---

[8] It is unclear why, in its discussion of the affidavits, the district court omitted any discussion of the one signed by Ralph Goldberg. See Kenny A. III, 454 F. Supp. 2d at 1290. For the sake of completeness, we will include it in our discussion.

were "disinterested Atlanta attorneys." Id. That finding is clearly erroneous. At oral argument, one of the two lead counsel for the plaintiffs conceded that he not only had recruited these attorneys to provide the affidavits but that in the past he had also supplied some of them with similar affidavits to help boost their own fee awards.[9]

Aside from the need to support those who support them, the lawyers who signed the affidavits have a financial interest in keeping the fee award in this case and every case like it as high as possible. The higher this fee award is the more

---

Four of the five affidavits indicate that they are from attorneys who practice regularly as plaintiffs' lawyers depending on attorneys' fee awards. The lone exception is John Chandler, whose affidavit indicates that although most of his work has been on the defense side he has also served as counsel for some plaintiffs' classes.

[9] Court:                      Who selected those lawyers who served as experts?

   Bramlett:          I sought those witnesses out. I mean the Court didn't say–

   Court:             I would be shocked if you told me you had never filed an affidavit for one of them.

   Bramlett:          You would be shocked and that would be incorrect. But, but the fact is that all four of these lawyers are highly experienced, highly competent, have practiced law in the Atlanta market–

   Court:             And highly interested in keeping the rates up and the multipliers as high as possible–

   Bramlett:          Ah.

useful it will be as precedent for the lawyer signing the affidavit when he seeks a high fee award in his own cases. The affiants are anything but "disinterested."[10]

The lodestar amount will never suffice for attorneys who practice in this area. They will always believe, in all sincerity, that they deserve more and that the justice system will function better if they are paid more. Lawyers who handle these kinds of cases cannot be disinterested witnesses because they are financially interested. To state this is not to slam lawyers in general or plaintiffs' lawyers in particular. It simply recognizes that because self-interest is hard-wired into human circuitry, no group is disinterested when it comes to the question of what members of the group are to be paid. Cf. H.L. Mencken, A Little Book in C Major 22 (John Lane Co. 1916) ("It is hard to believe that a man is telling the truth when you know that you would lie if you were in his place.").

Aside from the obvious self-interest of the affiants, the contents of the affidavits that were filed in this case are also flawed in other ways. For example, in each of them the affiant solemnly swore that the amount of compensable time

---

[10] The concurring opinion states that "[i]t cannot be reasonably contended that the able and experienced district judge in this case never considered the possibility that the affiants . . . could derive an indirect benefit from the precedential value of a high fee award." See infra at 83–84 (Wilson, J., concurring specially). Actually, the able and experienced district court judge himself explicitly found that the affiant attorneys were "disinterested." That finding, which underlay any credit the court gave to the affidavits, is clearly erroneous. It just is not true.

claimed in this case was "reasonable,"[11] was "reasonable, fair, and fully compensable,"[12] or was "fair, reasonable, and fully deserving of adequate and full compensation."[13] Yet, we know those assertions are not true. As we have already noted, the district court found that plaintiffs had inflated the number of hours for which they were due compensation in most of the fifteen billing categories and by a substantial amount. Kenny A. III, 454 F. Supp. 2d at 1274–84, 1286; supra at 10–11. The court's finding, which is being affirmed by this Court, that the hours submitted were not reasonable contradicts a key premise in every one of the lawyer affiants.

All five of the affidavits urged the district court to enhance the fee award based on the fact that plaintiffs' counsel advanced the cost of expenses.[14] That is not a permissible basis for an enhancement. See supra at 32–34. All of the affidavits urged the court to enhance the fee award because of the risk or

---

[11] (R32:495:Ex.F:4) (affidavit of John Chandler); (R32:495:Ex.G:4) (affidavit of Henry D. Fellows, Jr.); (R32:495:Ex.H:4) (affidavit of James C. Rawls).

[12] (R32:495:Ex.E:4–5) (affidavit of Ralph Goldberg).

[13] (R32:495:Ex.D:5) (affidavit of Ralph I. Knowles, Jr.) (emphasis omitted).

[14] (R32:495:Ex.D:6–8, 11) (affidavit of Ralph I. Knowles, Jr.); (R32:495:Ex.E:5–6) (affidavit of Ralph Goldberg); (R32:495:Ex.F:4–5) (affidavit of John Chandler); (R32:495:Ex.G:4–5) (affidavit of Henry D. Fellows, Jr.); (R32:495:Ex.H:4–5) (affidavit of James C. Rawls).

contingency factor.[15]  That, too, is an impermissible factor for an enhancement, as the concurring opinion in this case concedes.  See infra at 82 (Wilson, J., concurring specially). The Supreme Court itself has specifically ruled it out.  See supra at 34–36.  Four of the affidavits even urged the court to base its fee award on the common fund or common benefit doctrines,[16] which the district court correctly concluded was not legally permissible or even possible.  See Kenny A. III, 454 F. Supp. 2d at 1270–72; supra at 14.  The fact that the opinions expressed in all five of the affidavits were based on consideration of several improper factors makes any finding of the district court based on the affidavits clearly erroneous, and it renders any reliance the court placed on those affidavits an abuse of discretion.  As we have recognized, "[i]t would be a paradigmatic abuse of discretion for a court to base its judgment on an erroneous view of the law."  McNair v. Allen, 515 F.3d 1168, 1173 (11th Cir. 2008) (internal marks omitted) (quoting Schlup v. Delo, 513 U.S. at 333, 115 S. Ct. at 870 (O'Connor, J., concurring)); see also Koon, 518 U.S. at 100, 116 S. Ct. at 2047 ("A district court by definition abuses its discretion when

---

[15]  (R32:495:Ex.D:6–8, 11) (affidavit of Ralph I. Knowles, Jr.); (R32:495:Ex.E:5–6) (affidavit of Ralph Goldberg); (R32:495:Ex.F:4–5) (affidavit of John Chandler); (R32:495:Ex.G:4–5) (affidavit of Henry D. Fellows, Jr.); (R32:495:Ex.H:4–5) (affidavit of James C. Rawls).

[16]  (R32:495:Ex.D:8) (affidavit of Ralph I. Knowles, Jr.); (R32:495:Ex.F:5) (affidavit of John Chandler); (R32:495:Ex.G:4–5) (affidavit of Henry D. Fellows, Jr.); (R32:495:Ex.H:5) (affidavit of James C. Rawls).

it makes an error of law."); <u>United States v. Hall</u>, 349 F.3d 1320, 1323 (11th Cir. 2003) (explaining that if a district court decision is "based on an error of law, then it is by definition an abuse of discretion"). It is no less an abuse of discretion for a district court to base its decision on affidavits that are themselves based on legally erroneous assumptions.

Were it otherwise, there would be no end to enhancements and no limit to them. In every case where an established member of the Bar seeks an enhancement he will be able to get his colleagues who are interested in keeping fee awards as high as possible to sign affidavits stating that the only thing that will ensure adequate representation in cases like that one is a multi-million dollar enhancement. And some district court judges will credit those interested affiants as "disinterested attorneys."

But none of this and none of the multiple, specific, and serious defects in the affidavits that were filed in this case should obscure the more fundamental point, which is that enhancements for superior performance and results are not permissible, no matter how much the interested members of this particular segment of the bar might want them to be. <u>See</u> <u>supra</u> at 36–42. Supreme Court decisions cannot be overruled by affidavits.

6.

Our conclusion that the enhancement to the lodestar amount in this case was improper does not mean that one will never be appropriate under any circumstances. If, as the Supreme Court has instructed us, the proper calculation of the lodestar amount leaves "very little room" for enhancements, which may be proper only in "rare" and "exceptional" cases, Delaware Valley I, 478 U.S. at 565–66, 106 S. Ct. at 3098, where is that little room—and what are those rare and exceptional cases that may fit within it? We can think of some.

Suppose, for example, that an attorney's representation vindicates the federal rights of an unpopular client and as a result that attorney suffers a loss of standing in the community which damages his practice and income. The kind of situation we have in mind was discussed by Judge Frank M. Johnson, Jr., albeit not on the issue of enhancing a lodestar amount. Actually, the discussion came before the enactment of the § 1988 fee-shifting statute and was in the context of deciding the amount of fees that should be awarded by the court through the exercise of its equitable power. NAACP v. Allen, 340 F. Supp. 703 (M.D. Ala. 1972), aff'd in relevant part, 493 F.2d 614 (5th Cir. 1974). In deciding how much the attorney should receive, Judge Johnson stated:

> [A] lawyer representing black plaintiffs in an employment
> discrimination case, or in any civil rights litigation, is likely to suffer

48

social, political and community ostracism. This likelihood is multiplied, of course, in a case such as the present one in which plaintiffs have sued high-ranking state officials and have alleged and proved racial discrimination. Even more damaging to an attorney involved in such litigation is the probability that he will be estranged from other members of his profession who are unwilling to participate in, or even lend moral support to, suits seeking to vindicate the public good.

Id. at 710.

We hope that three-and-a-half decades after those words were written in the Allen case attorneys who represent victims of racial discrimination no longer suffer social, political, or professional ostracism. But attorneys who represent other types of plaintiffs might. It could happen to an attorney who represents a pedophile attacking a sexual offender registration law on Due Process grounds, or perhaps to an attorney in a small Bible Belt town who succeeds in having a popular public religious practice enjoined as contrary to the Establishment Clause. Whether those circumstances, and others we have not mentioned, would be proper ones for enhancing the lodestar amount are issues for other days. For now it is enough to recognize the possibility and to point out that the "rare" and "exceptional" circumstances that we have mentioned would be more likely to fit within the "very little room" that the Supreme Court has told us is left for enhancements. Delaware Valley I, 478 U.S. at 565–66, 106 S. Ct. at 3098. The Supreme Court decisions on fee-shifting do not clearly preclude an enhancement of the lodestar amount in those

49

circumstances. And an enhancement in those circumstances is less likely to result in double counting, or to encourage meritless lawsuits, or to go beyond the basic purpose of the fee-shifting statutes than the enhancement that the district court awarded in this case does.

Representing children who find themselves in foster care is not the same as representing activist atheists in the Bible Belt or pedophiles anywhere. The plaintiffs' attorneys in this case do not, and reasonably could not, claim to have suffered any social or professional ostracism, nor do they contend that their victory here will somehow damage their legal practice. To the contrary, vindicating the rights of helpless children is the kind of accomplishment that brings professional accolades and enhances one's standing in the community. It is to that type of enhancement, instead of a monetary one, that the attorneys must look for any satisfaction beyond the $6,012,802.90 they are already receiving for their work in this case.

And Mr. Bramlett, for one, has done so. The "Attorney Profile" on his law firm's website boasted of his "track record of results in class action litigation,"

listing three of his biggest successes.[17]  The one that was discussed the most was

described as follows:

> Prosecution of class action in conjunction with New York's Children's Rights, Inc. resulting in systematic reform of State of Georgia's dysfunctional foster care system and establishing that foster children have a right to counsel.
>
> The federal judge who presided over the case for Georgia's foster children wrote of the work performed by the legal team led by Jeff and Marcia Robinson Lowry of New York's Childrens' Rights, Inc.: "[P]laintiffs' counsel brought a higher degree of skill, commitment, dedication and professionalism to this litigation than the Court has seen displayed by the attorneys in any other case during its 27 years on the bench. . . . After 58 years as a practicing attorney and federal judge, the Court is unaware of any other case in which a plaintiff class has achieved such a favorable result on such a comprehensive scale."  454 F. Supp. 2d at 1289–90.[18]

The profile also recounted that Mr. Bramlett received the Elbert P. Tuttle

Jurisprudence Award from the Anti-Defamation League "for dedication to justice

and fair treatment for all people."[19]  He received that award in 2007 and he was

---

[17]  Bondurant, Mixson & Elmore LLP, Jeffrey O. Bramlett Attorney Profile, http://www.atlantageorgiatriallawyers.com/attorneys/business_torts_lawyer_bramlett.html (last visited Dec. 8, 2007).

[18]  Bondurant, Mixson & Elmore LLP, Jeffrey O. Bramlett Attorney Profile, http://www.atlantageorgiatriallawyers.com/attorneys/business_torts_lawyer_bramlett.html (last visited Dec. 8, 2007).

[19]  Bondurant, Mixson & Elmore LLP, Jeffrey O. Bramlett Attorney Profile, http://www.atlantageorgiatriallawyers.com/attorneys/business_torts_lawyer_bramlett.html (last visited Dec. 8, 2007).

also chosen as President-elect of the Georgia State Bar that same year.[20] Those honors came the year after the judgment that he helped secure was entered in this lawsuit. It appears that, if anything, Mr. Bramlett's professional standing and prestige, as well as his earning ability, have been enhanced as a result of his service as one of the lead counsel for the foster children.

The other co-lead counsel for the foster children in this case has not suffered any reduction in professional standing or livelihood because of her work in it, either. To the contrary, what she did in this case has furthered her credentials, her reputation, her chosen lifework, and the purpose of her organization. Marcia Robinson Lowry has litigated on behalf of children's welfare for more than a quarter of a century. She has "directed major litigation efforts in jurisdictions throughout the United States designed to promote major reform of child welfare systems." (R32:495:Ex.B:2.)

Ms. Lowry founded and is the Executive Director of the Children's Rights Group, a non-profit organization that advocates and litigates on behalf of children. The organization's website explains that, among other things, "Children's Rights files class action lawsuits on behalf of classes of abused and neglected children

---

[20] Bondurant, Mixson & Elmore LLP, Jeffrey O. Bramlett Attorney Profile, http://www.atlantageorgiatriallawyers.com/attorneys/business_torts_lawyer_bramlett.html (last visited Dec. 8, 2007).

who have contact with public child welfare systems, to enforce their legal rights. The goal of these lawsuits is to improve the functioning of state child welfare systems . . . ."[21]

As with any organization that is largely dependent upon donations and grants, Children's Rights cannot afford to hide its achievements, and it has not been shy about what it achieved in this case. In at least four press releases over the course of the lawsuit, Children's Rights trumpeted what it had done and was doing for "some of Atlanta's most vulnerable citizens,"[22] and it proudly proclaimed that "[a]fter so many years of failure and broken promises by the state, this lawsuit has given these abused and neglected children a voice."[23] The organization described one of the district court's rulings as "a landmark decision nationally and a huge victory for the rights of abused and neglected children."[24] It later referred to the

---

[21] Children's Rights, Frequently Asked Questions, http://www.childrensrights.org/site/PageServer?pagename=faq#Lawsuit (last visited June 5, 2008).

[22] Press Release, Children's Rights, New Settlement Guarantees the Right to Legal Counsel for Abused and Neglected Children in DeKalb County, Georgia, http://www.childrensrights.org/pdfs/press_releases/DeKalbCountySettle3%20231.pdf (last visited June 5, 2008)

[23] Press Release, Children's Rights, Settlement of Class-Action Lawsuit Mandates Sweeping Reform of Foster Care in Atlanta, Georgia (July 5, 2005), http://www.childrensrights.org/pdfs/press_releases/07-05-05.pdf (last visited June 5, 2008).

[24] Press Release, Children's Rights, Inc., In First Ruling of its Kind in Nation, Federal Judge in Georgia Rules Abused and Neglected Children Have Right to an Attorney While in State Custody (Feb. 8, 2005), at http://www.childrensrights.org/pdfs/press_releases/02-08-05.pdf

"groundbreaking settlement agreement" in the case, adding that the agreement "appears to be the first of its kind nationally, and we expect that children throughout Georgia and perhaps elsewhere in the country will benefit."[25] The accomplishments of Children's Rights in this case were discussed in its annual report: "In 2006–2007, we took the fight for America's abused and neglected children" to eight states.[26] Georgia is listed in the report as one of the eight states where Children's Rights took "the fight."[27]

The point is not that Ms. Lowry and her organization don't have every reason to boast about their role in this case. The point is that their work in this case is something that is in their interest to boast about. It is not something that requires more than the $495 per hour that Ms. Lowry received to attract her and her organization to this case. This area of the law is the sea in which they sail and class action lawsuits are their chosen vessel. It is what they do. They submitted

(last visited June 5, 2008).

[25] Press Release, Children's Rights, Inc., Landmark Settlement Guarantees the Right to Legal Counsel for Abused and Neglected Children in Atlanta, Georgia (Feb. 13, 2006), at http://www.childrensrights.org/pdfs/press_releases/3197_001.pdf (last visited June 5, 2008).

[26] Children's Rights, Inc., Annual Report, at 4 (2006–2007), http://www.childrensrights.org/pdfs/Annual%20Report%202006-2007.pdf (last visited June 5, 2008).

[27] Children's Rights, Inc., Annual Report, at 5 (2006–2007), http://www.childrensrights.org/pdfs/Annual%20Report%202006-2007.pdf (last visited June 5, 2008).

three-fourths of the billable hours in this lawsuit. Except for the relatively insignificant travel hours, they were paid at the high hourly rates they demanded. To suggest that the prospect of a huge monetary bonus was needed to attract them to this lawsuit is not only absurd, but it also demeans the dedication of Ms. Lowery and her organization. Cf. Delaware Valley I, 478 U.S. at 567, 106 S. Ct. at 3099 ("Clearly, Delaware Valley was able to obtain counsel without any promise of reward for extraordinary performance.").

The multi-million dollar enhancement, over and beyond the full lodestar sum that Ms. Lowery and her organization received, amounts to an involuntary, federal court ordered contribution from the taxpayers of Georgia to a non-profit organization. The perverse irony of the seven figure, court ordered gratuity in this case is that it reduces the amount of state funds available to care for what Children's Rights itself has described as some of Georgia's "most vulnerable citizens," the very group that the organization is dedicated to protecting.

For all of the reasons we have discussed, were we free to decide the issue we would readily conclude that the district court's award of a $4,500,000 enhancement to the lodestar amount in this case is an abuse of discretion, because it is based on an erroneous view of the law and reflects a clear error of judgment.

55

## C.

Unfortunately, under the prior panel precedent rule we are not free to decide the enhancement issue, but must instead follow this Court's earlier decisions in NAACP v. City of Evergreen, 812 F.2d 1332 (11th Cir. 1987), and Norman v. Housing Authority of Montgomery, 836 F.2d 1292 (11th Cir. 1988). Both of those decisions were issued after the Supreme Court last spoke on the subject of enhancements for quality of representation and superior results, which was in the Delaware Valley I case.

In the NAACP case, the plaintiffs' attorneys had requested a 50 percent enhancement of the lodestar amount, which was based, in part, on "the assertion that the relief obtained was of great benefit to the black citizens of Evergreen and represented exceptional success." NAACP, 812 F.2d at 1336. After the district court denied the request, the plaintiffs appealed and this Court vacated and remanded, in part because "[t]he district court's opinion does not address at all the last factor that the NAACP argued justified enhancement—that the relief obtained was of great benefit to the black citizens of Evergreen and represented exceptional success." Id. In remanding, the Court instructed:

> [T]he district court should make findings with regard to each of the grounds put forward by the NAACP as warranting an enhancement and relate those findings to its ultimate determination of the issue. We note, however, in remanding, that the Supreme Court has held that the

56

fact the results obtained would be of far-reaching significance to a large number of people usually is not grounds for enhancement, because the results obtained, as one of the <u>Johnson</u> factors, normally will be subsumed in the calculation of a reasonable fee and, therefore, usually should not provide an independent basis for increasing the fee award. <u>Blum v. Stenson</u>, 465 U.S. 886, 900, 104 S. Ct. 1541, 1549–50 (1984). The award may be enhanced, however, "in some cases of exceptional success." <u>Id.</u> at 897, 104 S. Ct. at 1548 (quoting <u>Hensley</u>, 461 U.S. at 435, 103 S. Ct. at 1940). The district court's reconsideration of the appropriateness of an enhancement based on this factor should be made in light of these principles.FN6

> FN6. The basic assumption of <u>Blum</u>, however, is that the district court will have taken factors such as the benefit obtained into account in its initial determination of the reasonable fee. There is no indication that the district court has done so in this case. In fact, it appears that the district court limited its consideration of the results obtained to its determination that the prevailing and unsuccessful claims were separable. On remand, the district court should take into account all relevant considerations put forth by the NAACP in determining the effect of the results obtained, as well as the effect of the other <u>Johnson</u> factors, on its initial calculation of a reasonable attorney's fee. It should then consider whether the NAACP has shown grounds for an enhancement of that initial calculation.

<u>Norman</u>, 812 F.2d at 1337 & n.6 (citations omitted).

In <u>Norman</u> the attorneys for the prevailing civil rights plaintiffs had requested a substantial enhancement of the lodestar amount based in part on the "quality of representation provided." <u>Norman</u>, 836 F.2d at 1297. In denying that request the district court found "that substantial results were obtained even if the

lawsuit was unnecessary to obtain them," but that an enhancement was inappropriate "because of the possibility of duplication of efforts and the possibility of improperly charged hours." Id. at 1297–98. This Court reversed the denial of the enhancement because "the wrong standards were applied." Id. at 1306.

In doing so, the Norman Court explained that "[i]f the results obtained were exceptional, then some enhancement of the lodestar might be called for." Id. at 1302 (citing Delaware Valley I, 478 U.S. at 564–65, 106 S. Ct. at 3098). It also stated that "[e]xceptional results are results that are out of the ordinary, unusual or rare," not those that are expected, because "[t]he law is usually faithful to its teachings, and so an outcome that is not unexpected in the context of extant substantive law will not ordinarily be exceptional." Id. These were among the remand instructions in the Norman case:

> Any enhancement begins with a finding that the results were exceptional; the district court has also failed to address this issue with reference to the extant substantive law. Accordingly, we remand for reconsideration. In adjusting the lodestar, as has been noted earlier, the court must take into account the significance of the results obtained in relation to those sought. It is at this point that the court may wish to make adjustments for unsuccessful theories and dismissal of the case as to some parties.
>
> Even if the court found the results obtained to be exceptional, no enhancement for these results would be justified unless the court also finds that class counsel's representation was superior to that

> which would have been expected considering the rates requested.
> Blum, 465 U.S. at 899, 104 S. Ct. at 1549.

Norman, 836 F.2d at 1306; accord Ass'n of Disabled Ams. v. Neptune Designs,

Inc., 469 F.3d 1357, 1359 (11th Cir. 2006) (dicta) ("The court may then adjust the

lodestar to reach a more appropriate attorney's fee, based on a variety of factors,

including the degree of the plaintiff's success in the suit." (footnote omitted));

Villano v. City of Boynton Beach, 254 F.3d 1302, 1308 (11th Cir. 2001) (dicta)

("If the court determines that the result obtained was an excellent result, then the

award of fees 'will encompass all hours reasonably expended on the litigation, and

indeed in some cases of exceptional success an enhanced award may be justified.'"

(citation omitted)); Duckworth v. Whisenant, 97 F.3d 1393, 1399 (11th Cir. 1996)

(dicta) ("After determining the lodestar amount as above, the court is entitled to

adjust the amount of final fees awarded in light of the results obtained through the

litigation.").

 The NAACP and Norman decisions both vacated district court orders

denying enhancements for superior results and issued remand instructions. Those

instructions, especially the ones in Norman, constitute a holding that superior

results coupled with superior performance can be the basis for an enhancement of

the lodestar amount. For the reasons we have already explained at length, we are

59

convinced that holding is wrong and conflicts with relevant Supreme Court decisions.

Nonetheless, as a later panel we are bound to follow it. Hurth v. Mitchem, 400 F.3d 857, 862 (11th Cir. 2005) ("[W]e are not permitted to reach a result contrary to a prior panel's decision merely because we are convinced it is wrong . . . ."); Smith v. GTE Corp., 236 F.3d 1292, 1303 (11th Cir. 2001) ("The idea of an exception to the prior panel precedent rule where a subsequent panel is convinced the prior one reached the wrong result—for whatever reason—is also inconsistent with a number of decisions in which panels of this Court have obediently followed prior panel precedents they were convinced were wrong."); id. at 1304 ("In summary, the parties' alternative argument boils down to the position that [a decision of this Court] incorrectly interpreted and applied [a Supreme Court decision] . . . . The prior panel precedent rule clearly forecloses their position."); Wascura v. Carver, 169 F.3d 683, 687 (11th Cir. 1999) ("Wascura argues that the reasoning of [a decision of this Court] is unclear and inadequate to support its holding. We have no occasion to pass on that criticism, because we are bound by [that] decision regardless of whether we agree with it."); United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong.").

60

Our colleague, Judge Wilson, is of the opinion that this Court's decisions in

NAACP and Norman are correct, that enhancements of the lodestar amount can and

should be allowed for the quality of representation and the exceptional nature of

the results obtained. While we respect those views, we are unpersuaded by them.[28]

The concurring opinion essentially adopts the position of the Sixth Circuit in

Geier v. Sundquist, 372 F.3d 784 (6th Cir. 2004), that the Supreme Court's holding

about performance enhancements in Delaware Valley I is nothing but dicta. Id. at

794.[29] That proposition is a matter of necessity for those who defend

---

[28] Both Judges Wilson and Hill have authored concurring opinions in this case. See n.3, supra. References in this opinion to "the concurring opinion" are to Judge Wilson's.

[29] The concurring opinion cites six additional cases from other circuits in support of its position that the district court may enhance the lodestar based on the quality of the representation and superior results: the Second Circuit's decision in Quaratino v. Tiffany & Co., 166 F.3d 422 (2d Cir. 1999), the Fourth Circuit's decision in Hyatt v. Apfel, 195 F.3d 188 (4th Cir. 1999), the Fifth Circuit's decision in Shipes v. Trinity Indus., 987 F.2d 311 (5th Cir. 1993), the Ninth Circuit's decision in Van Gerwen v. Guarantee Mutual Life Co., 214 F.3d 1041 (9th Cir. 2000), the Eighth Circuit's in Forshee v. Waterloo Industries, Inc., 178 F.3d 527 (8th Cir. 1999), and the Tenth Circuit's Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221 (10th Cir. 1997). There are three problems with reliance on those decisions.

For one thing, none of them actually holds that the lodestar may be enhanced based on the quality of representation. Indeed the Shipes decision rejected the district court's enhancement on that ground, holding that "[e]ven though Shipes's counsel presented extensive statistical data with competence, nothing less should be expected of counsel; consequently, this factor alone does not support enhancement." Shipes, 987 F.2d at 321.

Because the Quaratino case did not even involve, directly or indirectly, an enhancement of any type, Quaratino, 166 F.3d at 424, anything that opinion says about enhancements is pure dicta. Likewise, the issue before the court in Van Gerwen was "whether—and if so, how—a district court may permissibly reduce an attorney's fees award under federal fee-shifting statutes to reflect poor quality of representation." Van Gerwen, 214 F.3d at 1044. Because it was a fee reduction case, not an enhancement case, anything the Van Gerwen opinion says about

61

enhancements based on superior performance and the results it produces, because what the Court instructed us in the Delaware Valley I decision is that "it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." Delaware Valley I, 478 U.S. at 566, 106 S. Ct. at 3098. We should not worry about that instruction, Geier and the concurring opinion assure us, because it was just a summary of the Court's earlier Blum decision, and Blum did not say that. In other words, the Supreme Court in Delaware Valley I mischaracterized its own earlier decision in Blum. That view is wrong for two reasons. The first one, of course, is that the Supreme Court knows its decisions better than we do, and we are not free to disregard the Court's instructions because we think they may be based on a misreading of its own prior decisions.

---

enhancements is also dicta. Finally, in Forshee, the court of appals reversed the district court's fee enhancement because it was based on the contingent nature of the case. Forshee, 178 F.3d at 532. There was no evidence supporting an enhancement for superior representation or results. The court said: "the case was not unusually difficult or complex to prepare and try, the result while favorable to Forshee was not exceptional, Forshee gave only an impermissible reason for enhancement, and the district court made no 'detailed findings' that would justify an enhanced fee award." Id. As with the other two cases, anything the Forshee court said about superior representation or results is dicta.

Finally, none of the opinions from other circuits in those six cases engages in an extended discussion of the Supreme Court's Delaware Valley I and Dague opinions, nor do they confront the Supreme Court's reasoning in those two decisions, reasoning that is inconsistent with enhancements for superior representation and results.

62

Secondly, Geier and the concurring opinion are also wrong about the context in which the Supreme Court told us in Delaware Valley I that enhancements for superior performance and results are unnecessary. That key statement is not confined to a recitation of the Blum case. It is part of an additional discussion that follows one in which the Court had stated that the federal fee-shifting statutes "were not designed as a form of economic relief to improve the financial lot of attorneys." Delaware Valley I, 478 U.S. at 565, 106 S. Ct. at 3098. Instead, the Court explained, the sole purpose of those statutes is to enable "private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws." Id. That purpose, the Court emphasized, is satisfied if plaintiffs "find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee.'" Id.

Immediately after explaining that, in the next paragraph of the Delaware Valley I opinion, the Supreme Court made the statements that the concurring opinion and Geier would have us disregard. That paragraph, in its entirety, reads as follows:

> Moreover, when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the

63

reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

Id. at 565–66, 106 S. Ct. at 3098 (emphasis added).

That statement is not dicta. It might have been if the Court had somehow affirmed the fee enhancement for superior performance in Delaware Valley I, but the Court did not do that. Instead, the Court reversed the fee award because of the enhancement, stating in the very next sentence after the quoted paragraph: "With this teaching from our prior cases in mind, we sustain the Commonwealth's contention that the lower courts erred in increasing the fee award to Delaware Valley in Phase V based on the 'superior quality' of counsel's performance." Id. at 566, 106 S. Ct. at 3099.[30] The teaching the Supreme Court had in mind included the lesson that it was unnecessary to enhance fees for superior performance. Any additional statements about the particular evidence in that case that come later in

---

[30] As we explained earlier in this opinion, the Court carried over for reargument the next term the issue of whether an enhancement for contingency risk was proper. See Delaware Valley I, 478 U.S. at 568, 106 S. Ct. at 3100. But the Court did reverse the rest of the enhancement, including the increase for superior performance and exceptional results. Id. ("The judgment below is therefore affirmed insofar as it upheld the award of attorney's fees for the work done in Phases II and IX and, except for the multiplier for risk, is otherwise reversed." (emphasis added)).

64

the opinion are, at most, additional or alternative holdings.  See id. at 566, 106 S. Ct. at 3099 ("Furthermore, we are unpersuaded that . . ." (emphasis added)).

Even if the first holding stated in the Delaware Valley I opinion, which is that fee enhancements for superior performance and exceptional results are unnecessary, is viewed as one of two alternative holdings, we are still required to follow it.  See Massachusetts v. United States, 333 U.S. 611, 623, 68 S. Ct. 747, 754 (1948); Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 340, 48 S. Ct. 194, 196 (1928) ("It does not make a reason given for a conclusion in a case obiter dictum, because it is only one of two reasons for the same conclusion."); Johnson v. DeSoto County Bd. Comm'rs, 72 F.3d 1556, 1562 (11th Cir. 1996) ("[W]e are bound by alternative holdings"); McClellan v. Miss. Power & Light Co., 545 F.2d 919, 925 n.21 (5th Cir. 1977) ("It has long been settled that all alternative rationales for a given result have precedential value.").  The concurring opinion, the Sixth Circuit's decision in Geier, and our decisions in NAACP and Norman all disregard the teaching that the Supreme Court used as a basis for its decision in Delaware Valley I.  They all contradict the Supreme Court's holding that fee enhancements for superior performance and results are unnecessary.  We would not, if we were not bound by the prior precedent rule to do so.

The opinions concluding that enhancements for those reasons are appropriate also fail to mention, much less grapple with, the part of the Dague decision that discusses enhancements related to the merits of the federal claims that have been vindicated in the lawsuit. As we have already pointed out, see supra at 34–35, in the course of rejecting any enhancement to fee awards based on contingency, the Supreme Court unequivocally concluded in Dague that enhancements should not be granted based on the legal and factual merits of the claim or the difficulty of establishing those merits. Dague, 505 U.S. at 562–63, 112 S. Ct. at 2641. It is logically impossible to reconcile those clear instructions from Dague with the position that enhancements can be granted based on the superior performance of counsel in establishing the legal and factual merits. Which may be why Geier, NAACP, Norman, and the concurring opinion make no attempt to do so.[31]

---

[31] On a related point, the concurring opinion's reliance on our own decision in Villano, is misplaced. The Villano case had nothing to do with fee enhancements. Instead, it is a case in which the district court actually reduced the lodestar amount because the plaintiff did not prevail on all claims or against all of the defendants, and did not recover all of the damages he was seeking. Villano, 254 F.3d at 1304. The unremarkable holding of Villano is that before a court can reduce the lodestar amount for limited success it must consider not just the benefit the plaintiff obtained for himself measured in the damage award but also the public benefit of vindicating federal rights against a governmental entity. Id. at 1306–07. Of course.

But to say, as Villano does, that a fee award should not be reduced below the lodestar amount for partial success without considering all aspects of the success is one thing. To say, as the concurring opinion in this case does, that the lodestar should be increased for success if the public gained some benefit from having federal rights vindicated is an entirely different thing. Indeed, if public benefit through vindication of federal rights was enough to justify an enhancement of the lodestar amount, there would be an enhancement in every single fee case.

66

Despite our disagreement with the concurring opinion about the correctness of our NAACP and Norman decisions, we do agree that those decisions control the outcome of this case. They do not foreclose us from vacating the district court's judgment based on its improper consideration of the contingency nature of the award, the advancing of expenses, and the delay in payment of fees. However, our reading of the district court's opinion leaves us convinced that it would be pointless to remand to that court with instructions that it reconsider whether to give an enhancement, or the amount of one, free of those improper considerations. The district court was so obviously enamored with the performance of plaintiffs' counsel and with the result that they achieved, and so determined to reward them for it, that we have no doubt the court would simply reinstate the enhancement. So long as our NAACP and Norman decisions stand, the district court can, and would again on remand, reach the same result that we have before us and rest it on the basis of quality of representation and superior results. All that a remand would achieve is more delay and the generation of more billable hours.

There can be no fee award under § 1988 and its statutory cousins unless plaintiff's counsel has obtained a judgment establishing that some federal statutory or constitutional right has been violated. Every judgment that will support a fee award will have benefitted the public by vindicating federal rights and serving as a deterrence to future violations. Therefore, under the concurring opinion's logic, every fee award should be increased as a reward for success and on public benefit grounds. That cannot be.

67

Of course, this Court sitting en banc, or the Supreme Court, can overrule any prior decisions of this Court.  Unless and until this Court does overrule <u>NAACP</u> and <u>Norman</u>, we are constrained to let stand the $4,500,000 enhancement to the lodestar amount that is included in the district court's judgment in this case.

**VII.**

**AFFIRMED.**

WILSON, Circuit Judge, specially concurring:

I agree with the decision to uphold the fee award in this case. I do not, however, share my colleague Judge Carnes' view that the district court's decision and our own prior precedents in this area are inconsistent with the teachings of the Supreme Court. The Court has not held that quality of representation and exceptional results can never be grounds for an upward adjustment of the lodestar figure. To the contrary, the Court has allowed for the possibility of an enhancement based on these factors where, as here, specific record evidence indicates that the lodestar amount is insufficient to provide a reasonable fee. Accordingly, I concur in the result only.

## I.

In *Blum v. Stenson*, 465 U.S. 886, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984), the Supreme Court considered whether, and under what circumstances, quality of representation and exceptional results can support an enhancement of the lodestar. The Court noted that the quality of an attorney's representation "generally is reflected in the reasonable hourly rate." *Id.* at 899, 104 S. Ct. at 1549. However, the Court stated that this factor may justify an upward adjustment "in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly

rates charged and that the success was 'exceptional.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S. Ct. 1933, 1940, 76 L. Ed. 2d 40 (1983)). Because the attorneys in *Blum* offered no such evidence, the Court concluded that the district court's reliance on quality of representation as grounds for an enhancement amounted to double counting. *Id.* The Court indicated, however, that the outcome would have been different had there been specific evidence showing that an enhancement was necessary to reflect counsel's superior performance. *See id.* at 900, 104 S. Ct. at 1549 ("Absent specific evidence to the contrary, we cannot say that [the] rates . . . for these three attorneys do not fully reflect the quality of their representation.").

With respect to the results obtained, the Court said that this factor likewise will "generally . . . be subsumed within other factors used to calculate a reasonable fee," and therefore "it normally should not provide an independent basis for increasing the fee award." *Id.* at 900, 104 S. Ct. at 1549-50. The Court did not hold, however, that consideration of the results obtained is categorically impermissible. In fact, the Court took the opposite position, reiterating its prior statement from *Hensley*: "[W]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of

70

exceptional success an enhancement award may be justified." *Blum*, 465 U.S. at

901, 104 S. Ct. at 1550 (internal quotation marks omitted) (quoting *Hensley*, 461

U.S. at 435, 103 S. Ct. at 1940). Again, the Court indicated that the determinative

consideration is whether the record contains evidence "show[ing] that the benefit

achieved requires an upward adjustment to the fee." *Id.* at 900, 104 S. Ct. at 1550.

*Blum* thus establishes that enhancements for quality of representation and

exceptional results, while not warranted in most cases, are permissible where

supported by specific evidence. Therefore, to accept Judge Carnes' view that these

factors can never be grounds for an enhancement, one would have to conclude that

the Supreme Court has repudiated that aspect of *Blum*. I find little support for that

proposition. Judge Carnes' opinion cites language in *Pennsylvania v. Delaware*

*Valley Citizens' Council for Clean Air* (*Delaware Valley I*), 478 U.S. 546, 106 S.

Ct. 3088, 92 L. Ed. 2d 439 (1986), that, when read in isolation, arguably

characterizes *Blum* as having established a categorical rule against consideration of

the quality of representation and the results obtained. *See id.* at 565, 106 S. Ct. at

3098 ("[W]e specifically held in *Blum* that . . . the 'quality of representation,' and

the 'results obtained' from the litigation are presumably fully reflected in the

lodestar amount, and thus cannot serve as independent bases for increasing the

basic fee award." (quoting *Blum*, 465 U.S. at 898-900, 104 S. Ct. at 1548-1550)).

Judge Carnes' reliance on this passage is misplaced for a number of reasons. As an initial matter, the statement is internally inconsistent: while providing that the named factors "cannot serve as independent bases for increasing the basic fee award," it also indicates that the factors are only "presumably" reflected in the lodestar amount. Thus, even standing alone, the statement provides uncertain support for Judge Carnes' opinion's conclusion.

More significantly, the statement is not a holding of the Court. It is merely part of a discussion summarizing *Blum* and citing the case with approval. A review of the discussion as a whole makes clear that the Court was not purporting to alter *Blum* in any way. Indeed, in the sentence immediately following the language at issue, the Court restated *Blum*'s holding that upward adjustments are proper "in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Id.* (quoting *Blum*, 465 U.S. at 898-901, 104 S. Ct. at 1548-50). The Court's references to "specific evidence" are quoted from the portions of *Blum* addressing the showing necessary for an enhancement based on quality of representation.[1] Read in this context, the

[1] *See Blum*, 465 U.S. at 899, 104 S. Ct. at 1549 (stating that quality of representation "may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional'" (quoting *Hensley*, 461 U.S. at 435, 103 S. Ct. at 1940)); *id.* at 900, 104 S. Ct. at 1549 ("Absent specific evidence to the contrary, we cannot say that [the] rates . . . for these three attorneys do not fully

72

language cited by Judge Carnes' opinion cannot reasonably be characterized as a departure from *Blum*. Rather, it must be construed as a reaffirmation of *Blum*'s teachings concerning the "quality of representation" and "results obtained" factors: namely, that while these considerations are presumably reflected in the lodestar figure, and cannot serve as grounds for an enhancement where that is the case, the presumption may be rebutted by specific evidence.

The portions of *Delaware Valley I* setting forth the Court's holding confirm this interpretation. In concluding that the enhancement awarded by the district court was improper, the Court discussed the "quality of representation" factor in non-categorical terms consistent with *Blum*: "Because considerations concerning the quality of a prevailing party's counsel's representation *normally* are reflected in the reasonable hourly rate, the overall quality of performance *ordinarily* should not be used to adjust the lodestar, thus removing any danger of 'double counting.'" *Delaware Valley I*, 478 U.S. at 566, 106 S. Ct. at 3099 (emphasis added). Moreover, the Court conducted a case-specific analysis, explaining how the record before it failed to support an upward adjustment. *See, e.g.*, *id.* at 567, 106 S. Ct. at 3099 (noting that nearly one-third of hours reasonably spent on relevant phase of case were not compensated at hourly rate for most difficult work).

---

reflect the quality of their representation.").

It was this lack of evidentiary support—rather than a blanket rule against consideration of the quality of representation or the results obtained—that compelled reversal, as the Court repeatedly made clear. As to the attorneys' performance, the Court stated: "[V]iewing the evidence submitted by Delaware Valley to support its petition for attorney's fees, there is no indication as to why the lodestar did not provide a reasonable fee award reflecting the quality of representation . . . ." *Id.* The same conclusion applied to the results obtained: "Delaware Valley presented no specific evidence as to what made the results it obtained . . . so 'outstanding,' nor did it provide any indication that the lodestar figure for this portion of the case was far below awards made in similar cases where the court found equally superior quality of performance." *Id.* at 567-68, 106 S. Ct. at 3099. Finally, the Court deemed it significant that neither of the lower courts "made detailed findings as to why the lodestar amount was unreasonable, and in particular, as to why the quality of representation was not reflected in the product of the reasonable number of hours times the reasonable hourly rate." *Id.* at 568, 106 S. Ct. at 3099.

The Court left little doubt that these considerations were critical to its disposition of the case. Using language virtually identical to that of *Blum*, the Court concluded: "*In the absence of such evidence and such findings*, we find no

reason to increase the fee award . . . for the quality of representation." *Id.* at 568, 106 S. Ct. at 3099-100 (emphasis added). *Cf. Blum*, 465 U.S. at 900, 104 S. Ct. at 1549 ("Absent specific evidence to the contrary, we cannot say that [the] rates . . . for these three attorneys do not fully reflect the quality of their representation.").

These statements undermine any suggestion that *Delaware Valley I* precludes courts from ever considering the quality of representation and the results obtained as grounds for enhancing the lodestar figure. Such an interpretation cannot be squared with the Court's repeated descriptions of these factors as presumptively, but not absolutely, reflected in the lodestar figure. Moreover, had the Court intended to establish such a rule, its entire discussion concerning the deficiencies in the record and the lack of findings by the lower courts would have been unnecessary.

Judge Carnes' opinion argues that we may ignore the Court's statements regarding the record because they are merely alternative holdings. However, that view fails to account for the statement that immediately precedes the Court's record analysis: "Because considerations concerning the quality of a prevailing party's counsel's representation *normally* are reflected in the reasonable hourly rate, the overall quality of performance *ordinarily* should not be used to adjust the lodestar . . . ." 478 U.S. at 566, 106 S. Ct. at 3099 (emphasis added). At no point did the

75

Court suggest that this unambiguous statement of the governing law (a statement that Judge Carnes' opinion does not address) was somehow an alternative basis for its decision. Moreover, as discussed, the Court repeatedly made clear that the evidentiary deficiencies and lack of findings were essential to the outcome in the case. *See, e.g.*, *id.* at 567, 106 S. Ct. at 3099 ("In sum, viewing the evidence submitted by Delaware Valley to support its petition for attorney's fees, there is no indication as to why the lodestar did not provide a reasonable fee award reflecting the quality of representation provided during Phase V of the litigation."); *id.* at 568, 106 S. Ct. at 3099-100 ("In the absence of such evidence and such findings, we find no reason to increase the fee award . . . for the quality of representation."). There simply is no basis for concluding, as Judge Carnes' opinion does, that we are free to disregard virtually all of Part III.B of the Court's opinion.

Judge Carnes' opinion also relies on language in which the Court described enhancements for superior performance as "unnecessary" for purposes of enabling plaintiffs to secure legal assistance. *See id.* at 566, 106 S. Ct. at 3098. In the same discussion, however, the Court reiterated that such enhancements are not categorically barred, despite being disfavored as a general matter. In explaining the reasons for the "strong presumption" that the lodestar figure represents a reasonable fee, *see id.* at 565, 106 S. Ct. at 3098, the Court noted that an attorney

who accepts a case "obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests." *Id.* Therefore, the Court said, "[c]alculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, . . . adequately compensates the attorney, *and leaves very little room for enhancing the award based on his post-engagement performance*." *Id.* at 565-66, 106 S. Ct. at 3098 (emphasis added). The Court's subsequent description of performance-based enhancements as "unnecessary" must be read in light of that statement, which makes clear that such adjustments are permissible under narrow circumstances. Given that instruction, as well as the Court's numerous other statements articulating a non-categorical approach, the language cited by Judge Carnes' opinion cannot be read to preclude enhancements for performance in all cases.[2]

---

[2] Judge Carnes'opinion also asserts that enhancements for superior performance cannot be reconciled with *City of Burlington v. Dague*, 505 U.S. 557, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992), in which the Court held that enhancements for contingency are not permitted. As Judge Carnes' opinion notes, the *Dague* Court defined an attorney's contingent risk in a particular case as the product of "(1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *Id.* at 562, 112 S. Ct. at 2641. However, *Dague* is inapposite because, unlike an attorney's level of risk, the quality of his or her representation cannot be defined solely by reference to these two factors. Two attorneys could bring identical claims, the merits of which are equally difficult to establish. Even if both attorneys prevail, it does not follow that their respective performances were necessarily equal in quality. In any given case, a host of factors beyond those relating specifically to the merits of a claim are pertinent to assessing the quality of an attorney's representation. Nothing in *Dague* precludes courts from considering these additional factors as possible grounds for an enhancement.

Accordingly, I cannot accept the conclusion that our decisions in *NAACP v. City of Evergreen*, 812 F.2d 1332 (11th Cir. 1987), and *Norman v. Housing Authority of Montgomery*, 836 F.2d 1292 (11th Cir. 1988), were wrongly decided. In *NAACP*, the district court denied a request for an enhancement but failed to make findings with regard to one of the factors relied upon as a justification: "the assertion that the relief obtained was of great benefit to the black citizens of Evergreen and represented exceptional success." 812 F.2d at 1336. While stressing that the results obtained "normally will be subsumed in the calculation of a reasonable fee," *id.* at 1337, we noted that "[t]he award may be enhanced . . . 'in some cases of exceptional success,'" *id.* (quoting *Blum*, 465 U.S. at 897, 104 S. Ct. at 1548). We therefore remanded for reconsideration in light of those principles. *Id.* Similarly, in *Norman*, the district court failed to make a finding as to whether the results obtained were exceptional. 836 F.2d at 1306. In remanding, we were careful to note that even a finding of exceptional results would not support an enhancement unless the court also found that counsel's representation "was superior to that which would have been expected considering the rates requested." *Id.* (citing *Blum*, 465 U.S. at 899, 104 S. Ct. at 1549). *NAACP* and *Norman* thus

78

are fully consistent with the principles set forth in *Hensley*, *Blum*, and *Delaware Valley I*.[3]

Other circuits share our understanding of the Court's teachings. *See, e.g.*, *Geier v. Sundquist*, 372 F.3d 784, 794-95 (6th Cir. 2004) (concluding that *Delaware Valley I* permits enhancements based on quality of representation and results obtained in rare and exceptional cases); *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1046 (9th Cir. 2000) (stating that upward adjustment for quality of representation "is justified only in the rare case where there is specific evidence that the quality of service was superior in light of the hourly rates charged and that the success was exceptional"); *Hyatt v. Apfel*, 195 F.3d 188, 192 (4th Cir. 1999) (affirming enhancement for results obtained); *Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 532 (8th Cir. 1999) (stating that, to justify enhancement for

---

[3] Since *NAACP* and *Norman* were decided, we have repeatedly reiterated their understanding of the Court's teachings. *See Ass'n of Disabled Ams. v. Neptune Designs, Inc.*, 469 F.3d 1357, 1359 (11th Cir. 2006) (per curiam) ("The court may then adjust the lodestar to reach a more appropriate attorney's fee, based on a variety of factors, including the degree of the plaintiff's success in the suit."); *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1308 (11th Cir. 2001) ("If the court determines that the result obtained was an excellent result, then the award of fees 'will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.'" (quoting *Hensley*, 461 U.S. at 435, 103 S. Ct. at 1940)); *Duckworth v. Whisenant*, 97 F.3d 1393, 1396 (11th Cir. 1996) (per curiam order incorporating district court decision into opinion) ("After determining the lodestar, the court may adjust the amount depending upon a number of factors, including the quality of the results and representation of the litigation."); *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (per curiam) ("[The] 'lodestar' may then be adjusted for the results obtained.").

outstanding service and results, applicant "must establish that the quality of service rendered and the results obtained were superior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended" (internal quotation marks omitted)); *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) ("The lodestar may be adjusted based on several factors, including in particular the results obtained . . . ." (internal quotation marks and citation omitted)); *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1233 n.8 (10th Cir. 1997) ("The lodestar figure may be adjusted to suit the particular circumstances of the case, especially where the degree of success achieved is exceptional."); *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993) (noting that upward adjustments based on quality of representation and results obtained are proper where supported by specific evidence on record and detailed findings by lower courts). In each of these cases, the court recognized (at least implicitly) that *Delaware Valley I* did not fundamentally alter the controlling law regarding enhancements for outstanding performance and results. Judge Carnes' opinion thus conflicts not only with two decades of our own jurisprudence, but also with the decisions of numerous other courts.

## II.

In this case, the district court made detailed findings as to why the lodestar figure did not fully reflect the quality of representation and the exceptional results achieved. As to the former, the court found that "the quality of service rendered by class counsel, including their extraordinary commitment of capital resources, was far superior to what consumers of legal services in the legal marketplace in Atlanta could reasonably expect to receive for the rates used in the lodestar calculation." *Kenny A. ex rel. Winn v. Perdue* (*Kenny A. III*), 454 F. Supp. 2d 1260, 1288 (N.D. Ga. 2006). In support of that conclusion, the court cited affidavits submitted by four attorneys with extensive experience in the Atlanta legal market, particularly in the area of class action litigation. *See id.* at 1290. These attorneys each stated that the hourly rates claimed by counsel would not provide a fee sufficient to reflect the value of the services performed. For example, Henry D. Fellows, Jr. testified:

> In the current Atlanta market for legal services, the Standard Hourly Rates specified in the Declarations of Marcia Robinson Lowry and Jeffrey O. Bramlett would be generally inadequate and insufficient to induce lawyers of comparable skill, judgment, professional reputation and experience to perform the necessary services to prosecute a case of this magnitude on terms where the lawyers are not paid on an ongoing basis as the work is being performed, are required to advance case expenses of $1.7 million over a three year period with no ongoing reimbursement, and the lawyers' ability to recover a fee and expense reimbursement are completely contingent on the outcome of the case.

[Fellows Decl., R32:495:Ex.G:¶7; *see also* Knowles Decl., R32:495:Ex.D:¶11; Chandler Decl., R32:495:Ex.F:¶7; Rawls Decl., R32:495:Ex.H:¶7.]

In the view of three of these attorneys, a 1.5-2 multiplier was necessary to bring the fee award into line with awards in comparable class action litigations in the Atlanta market:

> Taking into account the work required to achieve the results obtained for the plaintiff class in this case, the level of expense and risk entailed for class counsel to prosecute this case over a three-year period with recovery of fee and investment in advanced case expenses, and fees actually awarded by courts in class actions in this district in securities, antitrust and other types of non-civil rights cases presenting comparable complexity and risk, a multiplier of no less than 1.5-2 times the lodestar amount . . . would yield a reasonable fee consistent with prevailing prices in the Atlanta legal market for legal services of comparable value.

[Fellows Decl., R32:495:Ex.G:¶8; *see also* Chandler Decl., R32:495:Ex.F:¶8; Rawls Decl., R32:495:Ex.H:¶8.]

Judge Carnes' opinion discounts these affidavits on the ground that the factors identified in them—the lack of ongoing payment, the advancement of case expenses, and the contingent nature of the fee recovery and reimbursement—cannot support an enhancement. I agree with that conclusion insofar as it pertains to contingency. *See City of Burlington v. Dague*, 505 U.S. 557, 567, 112 S. Ct. 2638, 2643-44, 120 L. Ed. 2d 449 (1992) (holding that enhancement for contingency is not permitted under fee-shifting statutes). The

other two factors, Judge Carnes believes, have already been accounted for because the lodestar was calculated using current rather than historic hourly rates. *See ante* at 33-34(citing *Norman*, 836 F.2d at 1302). But we did not hold in *Norman* that the use of current rates will always be sufficient to compensate for delayed payment. Here, the affidavit testimony indicates that the rates used to calculate the lodestar, although current, would be inadequate to provide a reasonable fee in light of the exceptionally high commitment of capital resources by the attorneys and the three-year delay in receipt of payment. The district court properly relied on this evidence in concluding that an upward adjustment was warranted.

Judge Carnes' opinion also faults the district court for failing to give sufficient weight to the testifying attorneys' own interest in securing a high fee award for plaintiffs' counsel in this case. But determinations as to the credibility and the weight of testimonial evidence are clearly within the purview of the district court in these circumstances. *See Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) ("[I]t is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony."). Such determinations always involve an assessment of the factors bearing upon a witness's objectivity. It cannot reasonably be contended that the able and experienced district judge in this case never considered the possibility that the

affiants—who are prominent Atlanta attorneys—might be known by plaintiffs'

counsel, or that they could derive an indirect benefit from the precedential value of

a high fee award. The court concluded, however, that these considerations were

outweighed by other factors that bolstered the probative value of their testimony.

These included the court's familiarity with the affiants, their reputations in the

Atlanta legal community, and their experience in complex class action litigations.

*See Kenny A. III*, 454 F. Supp. 2d at 1290. Absent any showing of clear error, it is

improper for us to second-guess the court's determination, even if we would have

made a different credibility finding or weighed the evidence differently. *Johnson*

*v. DeSoto County Bd. of Comm'rs*, 72 F.3d 1556, 1561 n.5 (11th Cir. 1996) ("The

credibility of competing experts and the weight to be accorded the evidence

submitted by both sides will, of course, be decided by the district court, subject

only to clearly erroneous review on appeal."); *Jones v. Childers*, 18 F.3d 899, 908

(11th Cir. 1994) ("We . . . will not presume to second guess the trial judge's

assessment of the credibility of the witnesses and the weight assigned to their

testimony."). Such deference is particularly appropriate in this case, given that the

defendants did not introduce evidence challenging the attorneys' conclusion that

an enhancement was necessary to yield a fee consistent with prevailing rates in the

Atlanta legal market for similar services.

In addition to the affidavits, the district court took into account its personal observations of the attorneys' performance in this case:

> [T]he court finds that the superb quality of [counsel's] representation far exceeded what could reasonably be expected for the standard hourly rates used to calculate the lodestar. Quite simply, plaintiffs' counsel brought a higher degree of skill, commitment, dedication, and professionalism to this litigation than the Court has seen displayed by the attorneys in any other case during its 27 years on the bench. The foster children of Fulton and DeKalb Counties were indeed fortunate to have such unparalleled legal representation, and the Court would be remiss if it failed to compensate counsel for this extraordinary level of service to their clients.

*Kenny A. III*, 454 F. Supp. 2d at 1288-89; *see also id.* at 1286 ("[B]ased upon the Court's own substantial experience and familiarity with the prevailing rates in Atlanta, and the Court's observation of the stellar performance of plaintiffs' counsel throughout this long and difficult case, it finds the requested hourly rates eminently fair and reasonable. If anything, they are too low.").

In the area of fee awards, it is well established that "[t]he court . . . is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment . . . as to value." *Norman*, 836 F.2d at 1303 (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)). As part of this determination, the court may factor in its personal assessment of the quality of counsel's representation. *See Duckworth v.*

*Whisenant*, 97 F.3d 1393, 1397 (11th Cir. 1996). The district court thus did not err in relying on these considerations as additional grounds for an enhancement.

As to the results obtained, the court found that the plaintiffs' success was "truly exceptional." *Kenny A. III*, 454 F. Supp. 2d at 1289. The court provided a detailed summary of the Consent Decree entered into by the parties, finding that it provided "sweeping relief to the plaintiff class" and was "comprehensive in its scope and detailed in its coverage." *Id.* Based on these considerations, the court found the result achieved to be "extraordinary," particularly in light of "the contentiousness of the litigation, complexity of the issues and the uncertainties and delays of further litigation." *Id.* at 1290 (internal quotation marks omitted). To underscore the truly exceptional nature of the outcome, the court again cited its own experience: "After 58 years as a practicing attorney and federal judge, the Court is unaware of any other case in which a plaintiff class has achieved such a favorable result on such a comprehensive scale." *Id.*

Judge Carnes' opinion takes issue with the court's statement that the remedial measures established by the Consent Decree go beyond the relief the plaintiffs likely would have obtained had they prevailed at trial. We have recognized, however, that the unexpected nature of a result is relevant to the determination of whether it is exceptional. *See Norman*, 836 F.2d at 1302 ("[A]n

outcome that is not unexpected in the context of extant substantive law will not ordinarily be exceptional.").  In finding exceptional results here, the district court did not err in considering the fact that the remedies agreed upon by the parties exceeded its own expectations as to the nature and scope of relief likely to result from this litigation.  *See id.* ("Exceptional results are results that are out of the ordinary, unusual or rare.").

Moreover, other courts have recognized that results similar to those obtained here can justify an enhancement.  For example, in *Hyatt v. Apfel*, 195 F.3d 188 (4th Cir. 1999), the Fourth Circuit affirmed an enhancement for results obtained where the plaintiff class prevailed in challenging a Social Security Administration policy pertaining to disability benefits.  The enhancement was proper, the court held, because the plaintiffs "succeeded in bringing about fundamental change to a recalcitrant agency," the challenged policy affected the determination of hundreds of thousands of disability claims, and the government promulgated new national regulations in response to the litigation.  *Id.* at 191-92.  The court also found it significant that "[t]hese results were obtained in the face of monumental resistance [by the government] on every claim."  *Id.* at 192.  These factors closely resemble those involved in this case, where the plaintiffs succeeded

in effecting systemic changes to the foster care systems in Fulton and DeKalb Counties, in spite of considerable opposition by defendants.

Likewise, in *Shipes v. Trinity Industries*, 987 F.2d 311 (5th Cir. 1993), the Fifth Circuit held that an enhancement might be warranted for the results obtained in a "lengthy and protracted" Title VII class action. *Id.* at 322. The court noted that the plaintiff's victory was complete on all issues and resulted in both substantial monetary damages and, "very importantly, future protection against discrimination in the form of injunctive relief." *Id.* The Consent Decree in this case provides similarly comprehensive relief. It remedies numerous existing deficiencies in the delivery of foster care services and provides safeguards against future unlawful conduct by defendants. These results are no less exceptional than those obtained in *Shipes*.

Additionally, we have recognized that the public benefit created by a lawsuit is an important factor in the determination of a reasonable fee award. In *Villano v. City of Boynton Beach*, 254 F.3d 1302 (11th Cir. 2001), we held that the district court erred in reducing a plaintiff's fee award without considering the public benefit of the case. *Id.* at 1307. We stated that "[p]ublic benefit is a distinct measure of success in civil rights actions," and thus it must be accounted for in the calculation of a fee award. *Id.* We further recognized that the

vindication of a constitutional right against a government institution heightens a lawsuit's public benefit by deterring future unconstitutional conduct by public officials. *Id.*; *see also Popham v. City of Kennesaw*, 820 F.2d 1570, 1580 (11th Cir. 1987) ("The affirmation of constitutional principles produces an undoubted public benefit that courts must consider in awarding attorneys' fees under Section 1988."). Accordingly, we instructed the district court as follows:

> On remand, the district court must examine the qualitative value of [plaintiff's] successes. In doing so, the court needs to account for the vital role private litigation plays in the enforcement of civil rights, the difficulties involved in sustaining those lawsuits, the heightened importance of such lawsuits when the defendant is a public body, and the public benefit that occurs when those lawsuits ultimately vindicate a constitutional right.

*Villano*, 254 F.3d at 1308 (citation omitted).

Although *Villano* involved the reduction of a fee award rather than an enhancement, its principles are relevant to this case. Through the provisions of the Consent Decree, the plaintiffs have obtained redress for the constitutional violations alleged in the complaint, thereby vindicating the constitutional rights of the class members. Given the scope of the remedial measures agreed to by the defendants, the public benefit created by this litigation is enormous. *See Norman*, 836 F.2d at 1302 (stating that vindication of class-wide rights is generally more significant than relief for isolated constitutional violation). This consideration

further supports the conclusion that an enhancement for exceptional success is warranted in this case.[4]

## III.

I find no abuse of discretion in the district court's fee award. The court made detailed findings as to why the lodestar did not fully reflect the quality of representation and the results achieved in this case, and those findings are supported by specific evidence in the record. Because I conclude that the district court's decision is consistent with controlling Supreme Court and Eleventh Circuit precedents, I concur only in the result.

---

[4] Judge Carnes' opinion argues that the public benefit created by a lawsuit cannot be a factor supporting an enhancement because every suit that vindicates a federal right benefits the public in some way. Therefore, he argues, taking the public benefit into account would result in an enhancement in every successful fee case. I disagree. The fact that every vindication of federal rights confers some public benefit does not mean that the benefit is equal in every case. The present case underscores this point. The district court's opinion demonstrates that the public benefit created here was truly exceptional, far exceeding that achieved in the majority of cases of this type. *See Kenny A. III*, 454 F. Supp. 2d at 1290 ("After 58 years as a practicing attorney and federal judge, the Court is unaware of any other case in which a plaintiff class has achieved such a favorable result on such a comprehensive scale."). Taking this factor into account is proper under the "results obtained" analysis, which asks whether the outcome in the case was "out of the ordinary, unusual or rare." *Norman*, 836 F.2d at 1302.

Hill, J., concurring:

I concur in the judgment. The enhancement by the district court is due to be affirmed because we are bound by the prior cases of our court, *NAACP v. City of Evergreen*, 812 F.2d 1332 (11th Cir. 1987), and *Norman v. Housing Authority of Montgomery*, 836 F.2d 1292 (11th Cir. 1988).

I do not add anything to my colleagues' discussions of the holding and opinions in those cases other than to acknowledge that they are scholarly and well done.

No doubt these additional writings will be of interest to jurists who might wish to pursue the matter in further proceedings, should any arise.